In re Frank R. SEIGEL, Epstein Becker & Green, P.C., Sandvik Tamrock L.L.C. f/k/a Tamrock USA, Marakon Oy, Sandvik Tamrock Oy, and Ilkka Jarvinen, Relators.

No. 08–05–00233–CV.

Court of Appeals of Texas, El Paso.

Feb. 16, 2006.

Frederick DeB. Bostwick, Bear, Kultgen, Brophy, Bostwick & Dickson, LLP, Waco, Jim Curtis, Kemp Smith, LLP, James A. Mounts, III, Delgado, Acosta, Braden & Jones, P.C., El Paso, for relators.

Steven C. James, El Paso, for interested party.

Before Panel No. 5 BARAJAS, C.J., McCLURE, and LARSEN, JJ.

## *OPINION*

ANN CRAWFORD McCLURE, Justice.

Relators, Frank R. Seigel, Epstein Becker & Green, P.C., Sandvik Tamrock L.L.C. f/k/a Tamrock USA, Marakon Oy, Sandvik Tamrock Oy, and Ilkka Jarvinen, seek a writ of mandamus directing the Honorable Linda Chew, Judge of the 327th District Court of El Paso County, to withdraw an order compelling discovery of privileged materials. We conditionally grant relief.

## FACTUAL SUMMARY

In May of 2000, Ismael Ortega was fatally injured in an accident involving a truck-mounted "Nordberg" portable crusher equipped with a "Rammer" hydraulic hammer and hydraulic boom. Metso Minerals Tampere Oy manufactured the portable crusher and Sandvik Tamrock Oy man-

ufactured the hydraulic boom and hammer. Metso Minerals Tampere Oy sold the portable crusher with the attached hammer and boom to Metso Minerals Industries, Inc. which in turn sold the equipment to Mr. Ortega's employer, Jobe Concrete.

Irma Ortega, individually and on behalf of the Estate of Ismael Ortega, and Consuelo Ortega (collectively referred to as Ortega) filed a wrongful death and survivorship action in the 34th District Court against Metso Minerals Industries, Inc., Metso Minerals Tampere Oy (collectively referred to as Metso), Sandvik Tamrock Oy, Sandvik Tamrock LLC f/k/a Tamrock U.S.A., Ilkka Jarvinen (collectively referred to as Sandvik), Marakon Oy, and other defendants. Metso cross-claimed against Sandvik and Marakon. Ortega was represented by Jim Scherr. Frank R. Seigel and Epstein, Becker & Green P.C. were among the attorneys and law firms which represented Sandvik.

Ilkka Jarvinen was a division manager of production and engineering for the manufacturer of the hydraulic boom and hammer, Sandvik Tamrock Oy. At his first deposition on March 26, 2003, Jarvinen testified that Sandvik had no knowledge that Metso intended to transport the boom horizontally, that safety precautions were not designed for horizontal transport, and a safe alternative design could have been developed if Sandvik had known of Metso's intent to transport the boom horizontally. Two months after Jarvinen's first deposition, Ortega, Sandvik, and Marakon entered into a letter agreement to dismiss these defendants from the suit. The defendants did not pay any consideration to obtain the dismissal and the agreement expressly provided that it did not constitute a settlement agreement, Mary Carter agreement, or any document which is discoverable under Texas or federal law. Paragraph 4 of the agreement provided:

A Specified Defendant, through one of its employees, will be reasonably available to provide Plaintiffs (1) a deposition for use at trial, or in-person trial testimony; (2) reasonably requested factual and technical advice; (3) reasonably requested technical records, documents, statistics and other tangible evidence as available; and if such evidence exists, to state why the Nordberg design for horizontal storage for transport was unsafe and that a safe alternative design could have been used. At Plaintiffs' request, and if such information exists, the Sandvik designated witness will provide information necessary to qualify the witnesses as an expert. There will be no compensation paid. However, Plaintiffs will pay for the reasonable costs for transportation, room and board, fax, mail, copying and reasonable and necessary related expenses.

Ortega non-suited Sandvik, Marakon, and Jarvinen in June 2003 through an amended pleading.

Metso did not seek discovery from Sandvik and Marakon. In early December 2003, Sandvik and Marakon negotiated a settlement agreement and release of Metso's cross-claim. On December 19, Ortega designated Jarvinen as an expert witness who would testify "as to the negligence of Defendants, the marketing, design and manufacturing defect of the boom and hammer."

In February 2004, Metso deposed Jarvinen. Relator Seigel represented Jarvinen at that deposition. When asked if there were an agreement with the plaintiffs that he would provide testimony in exchange for the dismissal of Sandvik, Jarvinen, testifying through a translator, answered "no." Later in the deposition the following exchange took place:

[Metso's counsel]: Do you have any information from any source that, as part

of the dismissal agreement, your company was to provide a witness to testify in this case?

[Jarvinen]: I am not aware of this, but I've been asked to appear as a witness, and I have answered in the affirmative.

Jarvinen went on to testify, as he had done in March of 2003, that the boom and hammer had been manufactured for vertical rather than horizontal transport, and that Sandvik had no knowledge of Metso's intent to transport the boom horizontally. In his opinion, horizontal transport of this boom was unsafe. If Sandvik had known that Metso intended to transport the boom horizontally, Sandvik could have developed a safe, alternative design. It appears from the deposition questions that Metso's counsel was suspicious that Jarvinen's testimony was being offered as part of an agreement with Sandvik and Marakon.

Shortly before trial, Metso settled with Ortega. On March 9, 2004, Ortega's attorney gave Metso's attorney a copy of the May 30, 2003 letter agreement. Ortega expressly offered to set aside the settlement agreement with Metso and go to trial. Metso did not accept this offer. Instead, it filed suit against Relators, alleging they had conspired to fraudulently induce Metso to dismiss the cross-claims against Sandvik and Marakon and to settle with Ortega. It also pled causes of action for fraud, abuse of process, and perjury.

Relators have filed special appearances which are still pending. Metso served discovery requests on all Relators seeking attorney-client communications related to the May 30, 2003 letter agreement. Relators claimed that the documents were protected by the attorney-client, work-product, and joint defense privileges, and filed privilege logs. Metso filed a motion to compel raising the crime-fraud exception to the attorney/client privilege. After reviewing the materials *in camera*, Respon-

dent overruled Relators' objections and granted the motion to compel.

## DISCOVERY OF PRIVILEGED DOCUMENTS

Relators contend they are entitled to mandamus relief because they established that the documents contained in the privilege logs are protected by the attorney-client, work product, and joint defense privileges, and Metso Entities failed to establish an exception.

### *Standard of Review*

Mandamus will lie only to correct a clear abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)(orig. proceeding). An appellate court rarely interferes with a trial court's exercise of discretion. A clear abuse of discretion warranting correction by mandamus occurs when a court issues a decision which is without basis or without reference to guiding principles of law. *See Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985)(orig. proceeding). With respect to resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court. *Walker*, 827 S.W.2d at 839–40. The relator must therefore establish that the trial court could reasonably have reached only one decision. *Id.* With respect to a trial court's determination of the legal principles controlling its ruling, the standard is much less deferential. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ. *Walker*, 827 S.W.2d at 840.

An appellate court will deny mandamus relief if another remedy, usually appeal, is available and adequate. *Street v. Second Court of Appeals*, 715

S.W.2d 638, 639–40 (Tex.1986) (orig. proceeding). Generally, privileged matters are not discoverable. *West v. Solito,* 563 S.W.2d 240 (Tex.1978). If a trial court erroneously orders that privileged material be disclosed, there is no adequate remedy at law and mandamus is the proper remedy. *Dillard Department Stores, Inc. v. Hall,* 909 S.W.2d 491 (Tex.1995); *Walker,* 827 S.W.2d at 843.

### The Privileges Asserted by Relators

 Relators asserted the attorney-client, work product, and joint defense privileges in response to the discovery requests. The attorney-client privilege protects from disclosure confidential communications between client and counsel made for the purpose of facilitating the rendition of legal services to the client. TEX.R.EVID. 503(b); *Huie v. DeShazo,* 922 S.W.2d 920, 922 (Tex.1996). This privilege attaches to the complete communication between attorney and client. *Marathon Oil Company v. Moye,* 893 S.W.2d 585, 589 (Tex. App.-Dallas 1994, orig. proceeding); *GAF Corp. v. Caldwell,* 839 S.W.2d 149, 151 (Tex.App.-Houston [14th Dist.] 1992, orig. proceeding). The subject matter of the information communicated is irrelevant when determining whether the privilege applies. *Marathon Oil,* 893 S.W.2d at 589; *Keene Corp. v. Caldwell,* 840 S.W.2d 715, 720 (Tex.App.-Houston [14th Dist.] 1992, orig. proceeding). The privilege attaches to legal advice and factual information included in completed communications between attorney and client. *Marathon Oil,* 893 S.W.2d at 589.

 Relators also asserted the joint defense privilege found in Texas Rule of Evidence 503(b)(1)(C). This privilege is sometimes called the common interest or community of interest rule. *In re Lexington Ins. Co.,* No. 14–03–01236–CV, 2004 WL 210576 at *2 (Tex.App.-

Houston [14th Dist.] February 2, 2004, orig. proceeding)(not reported in S.W.3d). It does not exist just for co-defendants. *In re Skiles,* 102 S.W.3d 323, 326 n. 2 (Tex.App.-Beaumont 2003, orig. proceeding); *see* TEX.R. EVID. 503(b)(1)(C). Instead, the rule, as one of its objectives, creates a privilege for a client to prevent the disclosure of confidential communications made for the purpose of facilitating the rendering of professional legal services, when such communications are made by the client's lawyer to a lawyer representing another party in a pending action and concerning a matter of common interest. *In re Skiles,* 102 S.W.3d at 326–27. It is not an independent privilege, but an exception to the general rule that no attorney-client privilege attaches to communications that are made in the presence of or disclosed to a third party. *Id.* at 326 n. 2.

Rule 192.5 generally precludes discovery of an attorney's work product. TEX. R.CIV.P. 192.5. Work product is defined as:

> (1) material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents; or
>
> (2) a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents.

TEX.R.CIV.P. 192.5(a). Rule 192.5 provides different levels of protection for two types of work product. Core work product is defined as "the work product of an attorney or an attorney's representative that contains the attorney's or the attorney's

representative's mental impressions, opinions, conclusions, or legal theories." TEX. R.CIV.P. 192.5(b)(1). Core work product is not discoverable. *Id.* Any other work product is discoverable only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the material by other means. TEX.R.CIV.P. 192.5(b)(2).

### Relators' Burden

A party resisting discovery bears the burden of proving any applicable privilege. *In re ExxonMobil Corp.,* 97 S.W.3d 353, 357 (Tex.App.-Houston [14th Dist.] 2003, no pet.)(orig. proceeding), *citing Huie,* 922 S.W.2d at 922. Rule 193.3 prescribes the procedure for asserting a privilege. TEX.R.CIV.P. 193.3. A party who claims that material or information responsive to written discovery is privileged may withhold the privileged material or information from the response. *Id.* The party must state in the response or in a separate document that information or material responsive to the request has been withheld, the request to which the information or material relates, and the privilege(s) asserted. *Id.* At the request of the party seeking discovery, the withholding party must describe the information or material withheld and assert a specific privilege for each item or group of items withheld. *Id.* At a hearing on a claim of privilege asserted under Rule 193.3, the party asserting the privilege must present any evidence necessary to support the privilege. TEX. R.CIV.P. 193.4(a). The evidence may be in the form of testimony or affidavits. *Id.* If the court determines that an *in camera* review is necessary, the material must be produced to the court for its review. *Id.* Metso does not contend that Relators failed to satisfy the requirements of Rules 193.3 and 193.4 or that they did not carry their burden of proving the applicability of the privileges.

### Burden Shifted to Metso

Once a party demonstrates the privilege applies, the burden shifts to the party seeking production to prove an exception exists. *See Marathon Oil,* 893 S.W.2d at 589–90. Metso relies on the crime-fraud exception found in Texas Rule of Evidence 503(d)(1) which provides that there is no privilege under Rule 503 if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud. TEX.R.EVID. 503(d)(1). The crime/fraud exception applies only if (1) the party asserting it establishes a *prima facie* case of contemplated fraud and (2) there is a relationship between the document for which the privilege is challenged and the *prima facie* proof offered. *Granada Corp. v. First Court of Appeals,* 844 S.W.2d 223, 227 (Tex.1992); *Warrantech Corp. v. Computer Adapters Servs., Inc.,* 134 S.W.3d 516, 527 (Tex.App.-Fort Worth 2004, no pet.). The *prima facie* case requirement is met when the proponent offers evidence establishing the elements of fraud and that the fraud was ongoing or about to be committed when the document was prepared. *In re AEP Texas Central Co.,* 128 S.W.3d 687, 692 (Tex.App.-San Antonio 2003, orig. proceeding); *Cigna Corp. v. Spears,* 838 S.W.2d 561, 569 (Tex.App.-San Antonio 1992, orig. proceeding). Mere allegations of fraud are insufficient. *Cigna Corp.,* 838 S.W.2d at 569; *see also In re Monsanto Co.,* 998 S.W.2d 917, 933–34 (Tex.App.-Waco 1999, orig. proceeding). The fact that the plaintiff's cause of action involves fraudulent conduct is insufficient. *Cigna Corp.,* 838 S.W.2d at 569. The fraud alleged to have

occurred must have occurred at or during the time the document was prepared and in order to perpetrate the fraud. *Id.* In addition to a finding that the discovery proponent has satisfied a *prima facie* case of fraud, the trial court must also make a finding that a nexus exists between the privileged documents and the alleged fraud. *Granada Corp.,* 844 S.W.2d at 227; *Freeman v. Bianchi,* 820 S.W.2d 853, 861–62 (Tex.App.-Houston [1st Dist.] 1991, orig. proceeding). This nexus must be established for each privileged document. *Freeman,* 820 S.W.2d at 861.

### Prima Facie Case of Contemplated Fraud

In its suit against Relators, Metso alleged that Relators entered into a civil conspiracy with Ortega to conceal the existence of the May 30, 2003 letter agreement and that the failure to disclose the letter agreement fraudulently induced Metso to settle with Sandvik and Ortega. Metso claimed that Relators committed fraud by failing to disclose the letter agreement in supplemental discovery responses and in response to Jarvinen's false deposition testimony. These same allegations are included in the motion to compel discovery of the attorney-client communications related to the May 30, 2003 letter agreement.

 To prevail on a fraud claim, a plaintiff must prove that (1) the defendant made a material representation that was false; (2) it knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce the plaintiff to act upon the representation; (4) the plaintiff actually and justifiably relied upon the representation; and (5) thereby suffered injury. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001); *Wil–Roye Inv. Co. II v.*

*Washington Mut. Bank, FA,* 142 S.W.3d 393, 407–08 (Tex.App.-El Paso 2004, no pet.). As a general rule, the failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Insurance Company of North America v. Morris,* 981 S.W.2d 667, 674 (Tex.1998); *Marshall v. Kusch,* 84 S.W.3d 781, 786 (Tex.App.-Dallas 2002, pet. denied). Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent. *Bradford v. Vento,* 48 S.W.3d 749, 755 (Tex.2001); *Marshall,* 84 S.W.3d at 786. Whether such a duty exists is a question of law. *Id.*

### No Duty to Supplement Discovery

 We will first consider whether Relators had a duty to disclose the letter agreement in supplemental discovery responses. The Rules of Civil Procedure impose a duty to supplement written discovery responses. TEX.R.CIV.P. 193.5. Metso relies on evidence that they served discovery requests on Ortega which required disclosure of all settlement agreements as well as the disclosure of experts. But Metso did not serve discovery requests on Sandvik or Marakon. Therefore, Relators did not owe Metso a duty to supplement. *See Austin Ranch Enterprises, Inc. v. Wells,* 760 S.W.2d 703, 710 (Tex.App.-Fort Worth 1988, writ denied).

### No Duty to Disclose During Deposition

The crux of Metso's argument is that Jarvinen changed his testimony between his first and second depositions as a result of Sandvik's settlement with Ortega. It complains that the Relators conspired to commit perjury in order to fraudulently induce Metso to dismiss its cross claim against Sandvik and to settle the underlying suit with Ortega.

*The First Deposition*

As we have noted, Jarvinen was first deposed in March 2003.

Q: I was asking the way your company expected the—the hammer and boom to be transported on the—once it was installed on the equipment. Was it expected to be transported in a 90–degree angle, upright?

A: All booms are delivered in the vertical position.

Q: Why is that?

A: The structure of the boom is such that it cannot be delivered in any other way.

Q: Did you—Did Nordberg provide your company with any type of specifications or design standards to indicate that they expected the boom to be transported on its side in a horizontal position?

A: No.

Q: Did—Was your company ever advised in any way that Nordberg—that Nordberg was intending to incorporate your rammer and boom so it would be transported on Nordberg equipment in a horizontal position?

A: I was at no point made aware of this.

Q: Okay. At all times did you expect the boom and hammer that you sold Nordberg to be transported upright in a 90–degree angle?

A: Yes, because a boom is exactly planned to be upright by its structure.

Q: What would be the usual assumption for usual design for usual transport of a boom?

A: It will be vertical.

Q: Did Nordberg give you anything to cause you to disregard the standard practice that the boom would be transported at all times in a horizontal position?

A: No.

Q: Had—All right. If Nordberg had disclosed to you that they intended to have your boom and rammer transported on—horizontally, on the side, would your company have done it—have designed it or manufactured it differently?

[Objection as to form]

A: As I said, this boom is designed to be used and transported vertical. If the boom is handled horizontally in the course of transportation, this necessitates changes in design. We were not aware of anything like this.

Q: If Nordberg had asked you and disclosed to you that they were going to transport it—or they wanted it to be transported horizontally on its side, would your company have addressed that design concern?

A: This would have been a matter of a separate negotiation. There is no such specification in this particular boom order.

Q: Okay. Would your company have the capability to design the—the boom for transport horizontally had you been asked to do so?

A: We certainly would have been able to [do] so, but as I said, this would have necessitated modifications in design.

Q: What modifications in design would have been needed in your opinion to safely transport the boom on its side?

[Objection as to form]

A: It would have been necessary to design a separate leaning device for the boom.... It would have been necessary to have an extra tilting design.... And this would have made it safe to lower the boom.... But this was not done.

. . .

Q: In terms of safety for the boom and the hammer does your company incorporate special safety features in the boom and hammer so that it can be safely transported vertically?

A: Vertically, yes.

Q: Was there any safety precautions designed into this boom and hammer so that it could be transported safely on its side horizontally?

[Objection as to form]

A: No, this was not done because we were not aware that this was going to be transported on its side.

*The Letter Agreement*

We have already detailed the contents of the letter agreement that was executed. There were, however, drafts circulated between the parties before the deal was consummated. The first draft appears to have been sent by Jim Scherr to Frank Seigel on April 17, 2003. Paragraph 4 of this draft provided:

4. Your clients and their employees will be made available for Plaintiffs for depositions, for trial, for factual and technical advice, for records, documents, statistics and other tangible evidence, for assistance, and for evidence to show the design on this Nordberg model for horizontal storage for transport was not safe and that there was a safer alternative (as defined by Texas law). At our request, your company will designate by name, address and phone number the person or persons who we can rely upon as factual and expert witnesses and your clients will provide the information required to designate them as experts. There will be no compensation paid, however we will pay for the reasonable costs for transportation, room and board, fax, mail, copying, translation and

reasonable and necessary related expenses.

Seigel responded to Scherr on April 29:

Paragraph 4 should be revised to provide that Sandvik Tamrock OY, through one of its employees, will be reasonably available to provide Plaintiffs (1) a deposition for use at trial or in-person trial testimony; (2) reasonably requested factual and technical advice; (3) reasonably requested technical records, documents, statistics and other tangible evidence as available; and if such evidence exists, to state why the Nordberg design for horizontal storage for transport was unsafe and that a safe alternative design could have been used. I do not believe our people will say that it was a bad design. I do think our people will be able to testify truthfully respecting some of the other issues.

Seigel sent Scherr another draft on May 29 which he had signed in his capacity as counsel for Sandvik. Paragraph 4 stated:

4. Sandvik Tamrock OY, through one of its employees, will be reasonably available to provide Plaintiffs (1) a deposition for use at trial or in-person trial testimony; (2) reasonably requested factual and technical advice; (3) reasonably requested technical records, documents, statistics and other tangible evidence as available; and if such evidence exists, to state why the Nordbert design for horizontal storage was unsafe and that a safe alternative design could have been used. (Specified Defendants are, at this time, unaware of such evidence.) At Plaintiff's request, and if such information exists, the Sandvik designated witness will provide information necessary to qualify the witnesses as an expert. There will be no compensation paid. However, Plaintiffs will pay for the reasonable costs for transportation, room

and board, fax, mail, copying and reasonable and necessary related expenses.

The next day, Seigel faxed the following to all of the attorneys involved with the negotiation:

### URGENT!

### PLEASE RUSH!

Gentlemen:

Attached please find yet another version of the agreement letter regarding the Ortega case. This version contains the following changes per Jim Scherr's request:

. . .

• '(Specified Defendants are, at this time, unaware of such evidence.) deleted from Paragraph 4.

With those changes, the settlement was completed.

*The Second Deposition: Testimony in Exchange for Dismissal*

At Jarvinen's deposition in February 2004, Metso's attorney asked about the existence of an agreement which would require Jarvinen to testify in exchange for the dismissal of his company from the suit:

Q: Is there any agreement between the plaintiffs, that is Mrs. Ortega, or her counsel, Mr. Scherr, that you would provide testimony in this case in the exchange for the dismissal or nonsuit of Sandvik Tamrock from the case?

[The Interpreter]: Question is complicated. I'll do my best.

A: The witness says no.

Later in the deposition, counsel asked Jarvinen whether he was aware that his company was dismissed from the case by Scherr. Jarvinen answered:

A: I am aware that the company was dismissed from the case, but I am un-

able to give any names. I am not aware if this case is with Mr. Scherr.

Counsel then asked:

Q: Do you have any information from any source that, as part of the dismissal agreement, your company was to provide a witness to testify in this case?

A: I am not aware of this, but I've been asked to appear as a witness, and I have answered in the affirmative.

Jarvinen was also cross-examined by Ortega's attorney:

[Mr. Scherr]: Mr. Jarvinen, your company, Sandvik Tamrock, was originally sued in this lawsuit by Mrs. Ortega. You know that, don't you?

[Jarvinen]: Yes.

Q: Shortly after your deposition was given in this case last year, Mrs. Ortega dropped your company from this lawsuit. You understand that.

A: I am aware of this.

. . .

Q: And no—you understand that no moneys or—no money was ever paid to Ms. Ortega in order for your company to be dropped; Ms. Ortega voluntarily dropped your company, relying upon your testimony, you understand?

[Objection as to form]

A: It is my conception that nothing was paid.

Q: In other words, Ms. Ortega dropped your company based on the honesty and forthrightness of yourself in explaining how this came to pass.

[Objection as to form]

A: I am not familiar with all details, as I am not familiar with Mrs. Ortega's reason for dropping, dismissing our firm

from the case, but it is my understanding that there's [sic] no money was paid.

Q: From Ms. Ortega's standpoint, do you recognize the only consideration she has today for you is to say thank you for your honesty?

[Objection as to form]

A: If that's how things are, then I must, indeed, be satisfied.

 Metso contends that Relators owed a duty to disclose the letter agreement in order to correct Jarvinen's false testimony. An attorney may reveal confidential information when the lawyer has reason to believe it is necessary to do so in order to prevent the client from committing a criminal or fraudulent act. TEX.DISCIPLINARY R.PROF.CONDUCT 1.05(c)(7)(1989), *reprinted in* TEX.GOV'T CODE ANN. Tit. 2, Subt. G, App. A (Vernon 2005)(State Bar Rules art. 10, § 9). An attorney may also reveal confidential information to the extent revelation reasonably appears necessary to rectify the consequences of a client's criminal or fraudulent act in the commission of which the attorney's services had been used. TEX.DISCIPLINARY R.PROF.CONDUCT 1.05(c)(8)(1989), *reprinted in* TEX.GOV'T CODE ANN. Tit. 2, Subt. G, App. A (State Bar Rules art. 10, § 9). Rule 3.03 prohibits an attorney from knowingly failing to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act. TEX.DISCIPLINARY R.PROF.CONDUCT 3.03(a)(2)(1989), *reprinted in* TEX.GOV'T CODE ANN. Tit. 2, Subt. G, App. A (State Bar Rules art. 10, § 9). Metso contends that Jarvinen's testimony about the dismissal agreement was perjurious and that counsel had a duty to correct it by disclosing the existence of the letter agreement. Jarvinen initially testified that there was no agreement that he would testify in exchange for the dismissal of his company

from the Ortega lawsuit. Later in the same deposition, he testified that he knew his company had been dismissed and he had been asked to testify but he did not have any knowledge of an agreement whereby he would testify in exchange for the dismissal.

A person commits perjury if, with intent to deceive and with knowledge of the statement's meaning, he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath. TEX.PENAL CODE ANN. § 37.02 (Vernon 2003). Aggravated perjury occurs where the false statement is made in connection with an official proceeding and is material. TEX.PENAL CODE ANN. § 37.03. A statement is material, regardless of the admissibility of the statement under the rules of evidence, if it could have affected the course or outcome of the official proceeding. TEX.PENAL CODE ANN. § 37.04.

The record contains no evidence that Jarvinen's testimony about the dismissal agreement was false. The letter agreement provided that a Sandvik employee would be available to testify but it did not specifically provide that Jarvinen would testify. More importantly, Jarvinen made it clear that he was unaware of the details surrounding the dismissal of Sandvik or any agreement pertinent to the dismissal of Sandvik. Consequently, there was no duty to disclose the dismissal agreement for this reason.

*The Second Deposition: Perjury in Exchange for Dismissal?*

Metso also contends that there was a duty to disclose because Jarvinen falsely testified that the Nordberg design was unsafe and there were safer alternatives. We understand it to argue that this false testimony was provided as consideration

for the letter agreement. As we have detailed, Jarvinen testified at his first deposition that the boom was designed only for vertical transport, Sandvik had no knowledge that Metso intended to transport the boom horizontally, safety precautions were not designed to cover horizontal transport, and a safe alternative design could have been developed if Sandvik had known of Metso's intent to transport the boom horizontally. We turn now to his second deposition in February 2004:

Q: Did Nordberg, in any way, to your knowledge, ever advise your company that Nordberg was intending to incorporate your hammer and boom so that it could be transported on Nordberg equipment in a horizontal position?

[Jarvinen]: No such information came.

Q: As manager of design and production of this very boom, from your company's standpoint, at all times did you expect that the boom and hammer that was sold to Nordberg would be transported upright, in a 90–degree angle?

A: That was our conception.

. . .

Q: If Nordberg had ordered, from your company, a boom and hammer to be transported horizontally, what would your company have done?

A: We would, in that case, have designed something different from the standard boom. And then on the basis of that, we should've offered them such a boom.

Q: What modifications would have been necessary, in your opinion as the manager of the design and production for Sandvik Tamrock, who designs and manufactures these very boom—this very boom and hammer, to accommodate transport in a horizontal position?

A: It would've been necessary to design a tilting or leaning device underneath the pedestal so that it would've been safe to manipulate the boom in such a way that it could be transported in this sideways position.

Q: What about fasteners? Are there— had your company been advised or requested to design and manufacture a boom for horizontal transport, would there have been modifications necessary in the fasteners to hold it in place?

A: Fasteners would have been part of the tilting device. .

. . .

Q: Based on your education at the Helsinki University of Technology, your degree in this field in 1965, and 24 years of experience leading up to you becoming manager of the production and design for Sandvik Tamrock, do you have an opinion as to whether there was a safer alternative to be used for the folding of the boom into a horizontal position?

A: In my estimation, there are safer options in existence.

Q: Would you please describe what safer options in existence at the time this piece of equipment was sold were available that would have prevented this incident?

[Objection as to form]

A: In the pictures that I have, underneath our boom, underneath the pedestal, a certain hinged base plate has been installed. My understanding is that the intention has been that, with the help of this plate, the boom could be leaned over into a horizontal position. But there is no sign of what kind of device for raising and lowering would be there. It's my understanding that, for this purpose, an excavator was used. And it's my understanding that onto this excavator boom, some kind of—. . . Some kind of raising

chain was attached. And I find this type of lifting very questionable. It involves a lot of risk. This, in my estimation, is the weak point in this. This could've been a lift, for example, a hydraulic lift had been installed there.

Q: Based on your background, experience and qualifications, looking at the photographs and the design that Nordberg Metso did on the platform, what do you see is the reasonably foreseeable risk inherent in that design.

[Objection]

A: As I said, this is in the device for lifting and lowering, the hinged plate is there. The weakness is in the lifting and lowering mechanism.

Q: Upon pulling the pin on this design by Metso, is it reasonably foreseeable that the—that there will be instability in the platform, and the boom and hammer could reasonably cause an accident?

[Objection as to form]

A: My—my understanding is that the intention was that, using an excavator and a chain, the boom would be tied to the excavator before the pin was pulled out. And this demands extreme caution and care. This method would surely work if it were performed very carefully. But there are risks.

. . .

Q: In your opinion, based on your background, experience and qualifications, is the design of this folding platform that Metso Nordberg was using dangerous?

[Objection as to form]

A: As I said, the actual hinged plate is okay in its own right. But in addition to that, it requires a reliable lifting and lowering device. I would not say that the solution used by Metso was impossible, but it involves certain risks. . . . As I said, the lifting device should be such that it functions reliably and is easy to use. A chain fixed to the far end of the boom of an excavator is not such a safe device.

We have exhaustively reviewed the record and considered Sandvik's contention that by deleting the portion of Paragraph 4 in the letter agreement that "(Specified Defendants are, at this time, unaware of such evidence.)," Jarvinen's later testimony was perjurious and had been planned while the truth had been concealed. However, given the consistency of Jarvinen's testimony, the first of which occurred before the negotiations began between Ortega and Sandvik, we cannot conclude that the second deposition was perjurious. We also note one other development which occurred between the two depositions. There is no apparent reference in Jarvinen's first deposition to any drawings or photographs of Metso's design for the horizontal boom. We look again to the agreement between Sandvik and Ortega, highlighting for clarity:

> Sandvik Tamrock OY, through one of its employees, **will be reasonably available to provide Plaintiffs** (1) a deposition for use at trial or in-person trial testimony; (2) reasonably requested factual and technical advice; (3) reasonably requested **technical records, documents, statistics and other tangible evidence as available; and if such evidence exists, to state why the Nordbert design for horizontal storage was unsafe and that a safe alternative design could have been used. (Specified Defendants are, at this time, unaware of such evidence.)** At Plaintiff's request, and if such evidence exists, the Sandvik designated witness will provide information necessary to qualify the witnesses as an expert.

This passage does not suggest that Sandvik was unaware that the design for hori-

zontal transport was unsafe. In fact, a Sandvik employee had already testified to exactly that. The passage specifies that **if** technical records, documents, statistics or other **tangible** evidence were found to exist, Sandvik would provide it to Ortega. However, at the time of the agreement, the defendants were unaware of such evidence. By the time of the second deposition, Jarvinen had reviewed a drawing by Metso demonstrating the process for lowering the boom for horizontal transport. He had reviewed the hinged plate and chain. His testimony about the weakness in the Metso design was premised directly upon the drawing he had only received the day of his deposition. While he had said all along that transporting the boom in a horizontal position was unsafe, he was able to pinpoint precisely the weakness in the Metso design once he reviewed their drawing. Because there is no evidence that Jarvinen's expert testimony in this regard is false, we perceive no duty under Rules 1.05 or 3.03 to correct the testimony or disclose the letter agreement on this basis.

## CONCLUSION

We conclude that Metso did not establish a *prima facie* case of contemplated fraud and that the crime-fraud exception is inapplicable. The trial court clearly abused its discretion by overruling Relators' objections to discovery and by granting the motion to compel discovery of the privileged materials. Because Relators have no adequate remedy at law, we conditionally grant relief. The writ will issue only if the trial court fails to comply with this opinion.

LARSEN, J. (sitting by assignment)(not participating).