# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 28, 2008

Charles R. Fulbruge III

Clerk

No. 06-20874

REGINALD CECIL LANE, an individual, by and through Linda Marlene
Lane, as the duly appointed Conservator/Guardian of Reginald Cecil Lane;
LINDA MARLENE LANE, an individual

Plaintiffs - Appellants

v.

HALLIBURTON, a Corporation; KELLOGG BROWN AND ROOT
HOLDINGS LLC; KELLOGG BROWN & ROOT INC, a Corporation and
Wholly Owned Subsidiary of Halliburton and Kellogg Brown and Root
Holdings LLC; SERVICE EMPLOYEES INTERNATIONAL INC, a Foreign
Corporation and Wholly Owned Subsidiary of Halliburton and Kellogg Brown
and Root International Inc; DII INDUSTRIES LLC, a Wholly Owned
Subsidiary of Halliburton Energy Services Inc, a Corporation;
HALLIBURTON ENERGY SERVICES INC, a Corporation; BROWN &
ROOT SERVICES, a Division of Kellogg Brown and Root, Inc, a Corporation;
KELLOGG BROWN & ROOT SERVICES INC, a Corporation and Wholly
Owned Subsidiary of Kellogg Brown and Root Inc; KELLOGG BROWN AND
ROOT INTERNATIONAL INC, a Corporation and a Wholly Owned
Subsidiary of Kellogg Brown and Root Inc, a Corporation; STRATEGIC
ECOMM INC; DOE DEFENDANTS 1 through 10

Defendants-Appellees

------------------------------------------------------------------------------------------------------

Consolidated with
No. 06-20905

No. 06-20874

KEVIN SMITH-IDOL, Individually

Plaintiff - Appellant

v.

HALLIBURTON, a Corporation; KELLOGG BROWN & ROOT INC, a Corporation and Wholly Owned Subsidiary of Haliburton; SERVICE EMPLOYEES INTERNATIONAL INC, a Foreign Corporation and Wholly Owned Subsidiary of Halliburton; KELLOGG BROWN & ROOT SERVICES INC, a Subsidiary of Kellogg Brown & Root; DII INDUSTRIES LLC, the Parent Company of Kellogg Brown & Root; KELLOGG BROWN AND ROOT INTERNATIONAL INC, the Parent Company of Service Employees International Inc

Defendants - Appellees

---------------------------------------------------------------------------------------------------

Consolidated with
No. 06-20915

INGRID FISHER, individually and as successor in interest to decedent Steven Fisher; KRISTEN FISHER, individually and as successor in interest to decedent Steven Fisher; STEVEN FISHER, JR, a minor, individually and as successors in interest to decedent Steven Fisher by and through next friend Ingrid Fisher; KATHLEEN FISHER, a minor individually and as successors in interest to decedent, Steven Fisher, by and through next friend Ingrid Fisher; MARJORIE BELL-SMITH, individually and as successor in interest to decedent Timothy Bell; CHA SADIE TUNSTALL, a minor, individually and as successor in interest to decedent Timothy Bell by and through her next friend Jacqueline Tunstall; ANDREW JACKSON BRADLEY, individually and as successor in interest to decedent William Bradley; HOLLIE HULETT, individually and as successor in interest to decedent Steven HULETT; ALEXANDRIA SLINGERLAND, individually and as successor in interest to decedent Steven HULETT; JACK SLINGERLAND, individually and as successor in interest to decedent Steven HULETT; LOIS PARKER, individually and as successor in interest to decedent Jeffrey Parker; MICHAEL BREZOVAY; NELSON HOWELL; BETSY MONTEGUE, individually and as successor in interest to decedent Jack Montegue;

2

JACQUELYNE MONTEGUE, a minor inivdually and as successor in interest to decedent Jack Montegue, by and through her next friend, Betsy Montegue; DONNA HOWELL; JACKIE LESTER; NAOMI LESTER; WILLIAM J PETERSON; EDWARD SANCHEZ, JR; DANA SANCHEZ; CALVIN KEITH STANLEY; RAYMOND T STANNARD; RICKY L TOLLISON; DANNY R WOOD; LISA HULETT, individually and as successor in interest to decedent Steven Hulett; APRIL JOHNSON, individually and as successor in interest to decedent Tony Johnson; JAMES BLACKWOOD; JOANN BLACKWOOD; NICHOLAS T CAFFEY; a minor, individually and as successor in interest to decedent Timothy Bell, by and through his next friend Karen Caffey; TIMOTHY E CAFFEY, Individually and as successor in interest to decedent Timothy Bell

                                        Plaintiffs - Appellants

v.

HALLIBURTON, a Corporation; KELLOGG BROWN & ROOT INC, a Corporation and Wholly Owned Subsidiary of Halliburton and Kellogg Brown & Root Holdings LLC; SERVICE EMPLOYEES INTERNATIONAL INC, a Foreign Corporation and Wholly Owned Subsidiary of Halliburton and Kellogg Brown & Root International Inc; KELLOGG BROWN & ROOT SERVICES INC, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc; DII INDUSTRIES LLC, a Wholly Owned Subsidiary of Halliburton Energy Services Inc, a Corporation; KELLOGG BROWN AND ROOT INTERNATIONAL INC, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc, a Corporation

        Defendants - Appellees

———————

Appeals from the United States District Court
for the Southern District of Texas

———————

Before KING, DeMOSS, and SOUTHWICK, Circuit Judges.

SOUTHWICK, Circuit Judge:

        This appeal consolidates three cases brought by civilian truck drivers, or their spouses and dependents (collectively "Plaintiffs"), against Halliburton, Kellogg Brown & Root, Inc., and various subsidiaries (collectively "KBR"), for

injuries sustained while working for KBR in Iraq. The district court dismissed all of the Plaintiffs' claims with prejudice, holding that their cases were nonjusticiable under the political question doctrine. On appeal, the Plaintiffs argue that KBR has not shown that resolving their tort claims will require the district court to answer a political question. We agree to the extent of concluding that the case needs further factual development before it can be known whether that doctrine is actually an impediment. We therefore reverse and remand.

## I. FACTS AND PROCEEDINGS

### A. Factual Background

Following the terrorist attacks of September 11, 2001, the United States led a military invasion of Afghanistan and, later, Iraq. In order to support its military mission, the United States Army awarded KBR a contract under the authority of its Logistics Civil Augmentation Program ("LOGCAP"). Pursuant to the LOGCAP contract, KBR provided logistical support services to the military forces operating in Iraq.

Under LOGCAP, the Army is authorized to employ "civilian contractors to perform selected services in wartime to augment Army forces." U.S. Army Reg. 700-137, at 1-1 (Dec. 16, 1985). LOGCAP contracts allow the Army to "achieve the maximum combat potential . . . by capitalizing on the civilian sector . . . ." Id. at 2-1(a). The record contains ample evidence that the military finds the use of civilian contractors in support roles to be an essential component of a successful war-time mission. Army Regulations provide that contractors employed pursuant to LOGCAP are not under the direct supervision of the military. U.S. Army Reg. 700-137, at 3-2(d). However, the regulations also establish that the military must assess the risk of any mission and determine whether contractor support is suitable in certain situations and locations. Id. at 2-4(b), 3-1(a). This assessment must consider "the safety of contractor personnel." Id. at 3-1(a).

The Army Field Manual makes clear that the military is responsible for providing adequate force protection and a safe workplace for contractors and their employees who are performing support services overseas. FM 3-100.21, at 6-4 to 6-6; see also Army Reg. 715-9, at 1-5(k)(2)-(3) (Oct. 29, 1999). The provisions of the LOGCAP contract and the relevant implementing Task Orders make the responsibility of the military explicit to provide security-related intelligence gathering and force protection for KBR convoys in Iraq.

To fulfill its obligations under the LOGCAP contract, KBR recruited civilian truck drivers in the United States to work in Iraq. Plaintiffs assert that KBR's recruitment materials misrepresented the risks that prospective employees would face in Iraq. Plaintiffs allege that KBR portrayed the work that the Plaintiffs would be performing as rebuilding activity and told recruits that they would not be sent to work in a "war zone or combat area." To support their claims, Plaintiffs point to information such as a web site that assured applicants that "[f]ull 24 hour a day U.S. military protection will be in place to insure safety. With new heightened security you'll be 100% safe." In addition, KBR circulated a memorandum to its employees asserting that while their work would be performed in a "hostile environment . . . [t]his does not mean your safety will be compromised." The Plaintiffs allege that these and other misrepresentations by KBR regarding the nature of the work and the level of safety the Plaintiffs could expect in Iraq induced Plaintiffs to enter into and remain in the employment of KBR.

Plaintiffs allege that KBR's promises of a safe work environment were proven false in April 2004. On April 8, 2004, Plaintiff Kevin Smith-Idol was transporting fuel when his convoy came under attack by Iraqi insurgents. Smith-Idol was injured as a result of the insurgent attack.[1] The next day,

---

[1] Smith-Idol v. Halliburton, et al., No. 06-20905 (5th Cir. filed Nov. 21, 2006).

additional fuel convoys were deployed; attacks on these convoys resulted in the injury and death of more KBR truck drivers.[2] Plaintiffs allege that KBR authorized these convoys even though it was aware that the routes they would travel were subject to a very high risk of insurgent attack.

The Plaintiffs also allege that KBR misrepresented its ability to halt work if conditions in Iraq posed a threat to employee safety. The KBR memorandum discussed above also assured employees that "[e]ach of you has . . . authority to stop any activity which you believe to be unsafe." However, the Plaintiffs allege that KBR failed to halt its convoys even though it knew conditions were unsafe in April 2004 or failed to inform its employees that conditions were unsafe, preventing them from opting not to participate in the convoys.

According to the Plaintiffs, KBR bears responsibility for their injuries under various theories of state and federal law. Their state law claims break down into two general categories. The first are fraud based claims including fraud and deceit, fraud in the inducement, intentional concealment of material facts, intentional misrepresentation, and civil conspiracy to commit fraud. The essence of these claims is that KBR utilized intentionally misleading and false advertisements and recruiting materials to induce Plaintiffs to accept employment with KBR and relocate to Iraq. As a result of their reliance on these statements, Plaintiffs allege that they suffered damages.

The second set of state law claims are not based on fraud. The Plaintiffs in each of the three cases allege that KBR's actions constituted intentional infliction of emotional distress under Texas law. In addition, the Lane Plaintiffs assert claims for negligence and gross negligence. Some of the Fisher Plaintiffs assert wrongful death and survivorship causes of action under Texas law.

---

[2] The two remaining consolidated cases involve drivers (or their representatives) who were involved in the April 9 convoys. Lane v. Halliburton, et al., No. 06-20874 (5th Cir. filed Nov. 13, 2006) (Lane and his wife); Fisher, et al. v. Halliburton, et al., No. 06-20915 (5th Cir. filed Nov. 27, 2006).

In addition to their state law claims, Plaintiff Smith-Idol and the Fisher Plaintiffs allege federal civil rights violations under 42 U.S.C. § 1983 and violations, along with conspiracy to commit violations, of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d). The Lane Plaintiffs do not allege violations of federal law.

B. Disposition by the District Court

The district court dismissed Fisher v. Halliburton first, holding that the Plaintiffs' claims raised nonjusticiable political questions.[3] Under the district court's analysis, the Fisher Plaintiffs' claims were "inextricable" from three of the six political question formulations identified in Baker v. Carr, 369 U.S. 186, 217 (1962). Fisher v. Halliburton, 454 F. Supp. 2d 637, 639-45 (S.D. Tex. 2006). First, the claims against KBR involved a textual constitutional commitment to a coordinate political branch of government because resolution of those claims would require the court to review the Executive's conduct of military matters in Iraq. Id. at 640-41. Next, the court stated that it was aware of no judicial standards by which it could review the Army's decisions regarding war-time intelligence gathering, troop deployment, and convoy protection. Id. at 641-44. Finally, the court suggested that a decision in the case would necessarily involve a judicial determination as to whether it was appropriate for the military to

---

[3] KBR argued alternatively that it was immune from suit under various theories of official immunity and that the suit was barred by the Defense Base Act, 42 U.S.C. §§ 1651-1654. The district court relied solely on the political question doctrine in dismissing the suit, stating that KBR's alternative defenses were moot due to the district court's lack of subject matter jurisdiction. Fisher, 454 F. Supp. 2d at 639 n.14. KBR has also raised those defenses on appeal. However, we consider only whether the political question doctrine presents a jurisdictional bar to the district court's adjudication of the Plaintiffs' claims. We express no opinion on the merits of KBR's alternative defenses to liability. Furthermore, we do not mean to indicate that the district court is bound to continue its efforts to extricate the Plaintiffs' claims from the military's decisions indefinitely. If any of KBR's alternative arguments "weigh heavily in favor of dismissal," the district court might determine whether there is a "less burdensome course" of disposing of the Plaintiffs' cases without reaching their merits. See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 127 S. Ct. 1184, 1194 (2007).

dispatch convoys in April 2004, and, in a broader sense, whether it was wise for the Executive to use civilian contractors in a war zone. Id. at 644. The decision would invoke the third Baker formulation because it would involve policy determinations that were better suited for nonjudicial discretion. Id.

The district court's order did not separately analyze the Fisher Plaintiffs' various claims. Although it set forth the various claims, the order undertook a general view of the case presented and concluded that it "[could not] try a case on a battlefield during war-time without an impermissible intrusion into powers expressly granted to the Executive by the Constitution." Id. at 641. The district court subsequently dismissed the two other cases that have been consolidated for this appeal. The orders in both of those cases provide a brief factual and procedural background unique to the respective plaintiffs, but grant KBR's motion to dismiss for the reasons enumerated in the Fisher Order. See Smith-Idol v. Halliburton, No. 4:06-cv-01168, 2006 WL 2927685 (S.D. Tex. Oct. 11, 2006); Lane v. Halliburton, No. 4:06-cv-01971, 2006 WL 2796249, (S.D. Tex. Sept. 26, 2006). Like the Fisher Order, these orders do not separate the Plaintiffs' various causes of action for analysis.

In the district court's view, the most important facts in these three cases were derived from the language of KBR's LOGCAP contract and the relevant Army regulations. These documents, governing KBR's actions in every case and overriding the individual facts of any particular case, "show overwhelmingly that the Army was an integral part of any decision to deploy and protect convoys." Fisher, 454 F. Supp. 2d at 643.

## II. DISCUSSION

### A. Standard of Review

In each of these cases, the district court granted KBR's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). We review de novo the district court's dismissal under Rule 12(b)(1),

just as we would a dismissal under Rule 12(b)(6). Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot and Wansbrough, 354 F.3d 348, 351 (5th Cir. 2003). In reviewing the dismissal order, we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff. In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007).

Under Rule 12(b)(6), a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965-66 (2007). This analysis is generally confined to a review of the complaint and its proper attachments. Fin. Acquisition Partners v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006). However, under Rule 12(b)(1), the court may find a plausible set of facts by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996).

In these appeals, we must determine by viewing the allegations in the most favorable light, whether the Plaintiffs can prove any plausible set of facts that would permit recovery against KBR without compelling the court to answer a nonjusticiable political question. Specifically, would resolving the Plaintiffs' tort-based legal claims invariably require analyzing the Executive's war-time decision-making, or do KBR's actions and motives form the sole issues?

B. Political Question Doctrine – General Principles

"Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." Marbury v. Madison, 5 U.S. 137, 170 (1803). This "political question" doctrine reflects the principle that, under our Constitution, there are some questions that cannot be

answered by the judicial branch. Out of due respect for our coordinate branches and recognizing that a court is incompetent to make final resolution of certain matters, these political questions are deemed "nonjusticiable." See Baker, 369 U.S. at 198. A declination of jurisdiction under the doctrine presupposes that another branch of government is both capable of and better suited for resolving the "political" question. See Vieth v. Jubelirer, 541 U.S. 267, 277 (2004); Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 229-30 (1986).

Political questions are labeled "nonjusticiable" because there is an undeniable difference between finding no federal jurisdiction at the outset of a case and declaring that a particular matter is inappropriate for judicial resolution only after some consideration of the merits. Baker, 369 U.S. at 198.

> In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.

Id. The Baker analysis is not satisfied by "semantic cataloguing" of a particular matter as one implicating "foreign policy" or "national security." Instead, Baker demands a "discriminating inquiry into the precise facts and posture of the particular case" before a court may withhold its own constitutional power to resolve cases and controversies. Id. at 216.

To aid courts in the "discriminating inquiry," the Supreme Court identified "formulations" that may help determine whether a particular case raises a political question, which we enumerate though the Supreme Court did not:

(1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;"

(2) "a lack of judicially discoverable and manageable standards for resolving it;"

(3)    "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;"

(4)    "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;"

(5)    "an unusual need for unquestioning adherence to a political decision already made;"

(6)    "or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. at 217. "[T]he inextricable presence of one or more of these factors will render the case nonjusticiable under the Article III 'case or controversy' requirement . . . ." Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum, 577 F.2d 1196, 1203 (5th Cir. 1978).

At the outset, we acknowledge that the Plaintiffs' claims are set against the backdrop of United States military action in Iraq. Thus, these cases are at the very least in sight of an arena in which the political question doctrine has served one of its most important and traditional functions – precluding judicial review of decisions made by the Executive during wartime. At one time, the Supreme Court appeared to have categorically removed disputes implicating "the conduct of foreign relations" from judicial purview. See Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918). Later, the Court declared that "it is not the function of the Judiciary to entertain private litigation – even by a citizen – which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region." Johnson v. Eisentrager, 339 U.S. 763, 789 (1950). And in Gilligan v. Morgan, in the course of declaring nonjusticiable a challenge to readiness decisions made and orders given by the Ohio National Guard, the Court made the following observation:

> It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches . . . . Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.

413 U.S. 1, 10 (1973). This court has followed the command that matters implicating foreign relations and military affairs are generally beyond the authority or competency of a court's adjudicative powers. E.g., Farmer v. Mabus, 940 F.2d 921, 923 (5th Cir. 1991); Occidental, 577 F.2d at 1203.

On the other hand, not all questions "touching foreign relations" are nonjusticiable. Baker, 369 U.S. at 211; see Can v. United States, 14 F.3d 160, 163 (2d Cir. 1994) ("The political question doctrine must be cautiously invoked . . . ."). Indeed, the Court warned that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id. Before declaring cases such as these to be nonjusticiable, a court must undertake "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." Id. at 211-12; see Dickson v. Ford, 521 F.2d 234, 235-36 (5th Cir. 1975).

With these principles in mind, we turn to the district court's application of the Baker formulations to these particular cases.

C. Application of the Baker Formulations

The district court concluded that the Plaintiffs' cases met "not one, but three of the formulations described in Baker v. Carr." Fisher, 454 F. Supp. 2d

at 644. As we discuss the Baker factors, we are mindful that the purpose of the political question doctrine is to bar claims that have the potential to undermine the separation-of-powers design of our federal government. Although the Baker formulations provide useful analytical guideposts in our analysis, "[w]hether an issue presents a nonjusticiable political question cannot be determined by a precise formula." Saldano v. O'Connell, 322 F.3d 365, 368 (5th Cir. 2003). We are asked to declare that the very design of our federal government compels the Plaintiffs to seek redress from the political branches for KBR's alleged fraudulent and negligent acts. This requires a "delicate exercise in constitutional interpretation," an exercise that is not satisfied by simplistically plugging facts into factors. See Baker, 369 U.S. at 211.

### 1. Textual commitment

The district court first found that the issues raised by the Plaintiffs' claims implicated a "textually demonstrable constitutional commitment" to the Executive Branch, namely, that war and foreign policy decisions are for the Executive. Fisher, 454 F. Supp. 2d at 640-41. Of course, the Constitution commits to Congress the power to raise and support an army and navy, and to the Executive the responsibilities of commanding those armed forces. U.S. Const. art. I, § 1, cls. 12-14; art. II, § 2. The "decisions whether and under what circumstances to employ military force are constitutionally reserved for [these two] branches." Tiffany v. United States, 931 F.2d 271, 277 (4th Cir. 1991). The "strategy and tactics employed on the battlefield are clearly not subject to judicial review." Id.

We disagree with the district court's "textual commitment" analysis because at this stage we cannot find that all plausible sets of facts that could be proven would implicate particular authority committed by the Constitution to Congress or the Executive. Examples of cases that implicate a textual commitment of constitutional authority to the Executive Branch include a

challenge to the President's decision to deploy troops in a foreign land, Eisentrager, 339 U.S. at 789, or mine the harbors of another country in the course of a war against that country, DaCosta v. Laird, 471 F.2d 1146, 1153-57 (2d Cir. 1973); so too has such a textual commitment been involved when a suit seeks judicial oversight of training procedures employed by the National Guard, Gilligan, 413 U.S. at 5-10, requests an injunction of all nuclear testing, Pauling v. McNamara, 331 F.2d 796 (D.C. Cir. 1963), or requires the resolution of a territorial dispute between foreign sovereigns, Occidental, 577 F.2d at 1202-03. These are matters that the President is constitutionally privileged to address.

In addition, as these cases suggest, the first Baker formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government. See McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1359 (11th Cir. 2007). KBR is not part of a coordinate branch of the federal government. Therefore, to invoke the "textual commitment" factor, KBR faces a "double burden." Id. "First, [KBR] must demonstrate that the claims against it will require reexamination of a decision by the military. Then, it must demonstrate that the military decision at issue is . . . insulated from judicial review." Id. at 1359-60 (emphasis in original; citation omitted).

Contrary to the situations regarding matters of war, there is no textual commitment to the coordinate branches of the authority to adjudicate the merits of the Plaintiffs' claims against KBR for breach of its duties. In fact, when faced with an "ordinary tort suit," the textual commitment factor actually weighs in favor of resolution by the judiciary. See Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49-50 (2d Cir. 1991). It is an extraordinary occasion, indeed, when the political branches delve into matters of tort-based compensation. See, e.g., September 11th Victim Compensation Fund of 2001, Pub. L. No. 107-42, §§ 401-409, 115 Stat. 230, 237-41 (2001). Viewing the facts in a light most favorable to the Plaintiffs, their claims challenge actions taken and omissions made only by

14

KBR. That company's conduct can be examined by a federal court without violating the Constitution's separation of powers.

### 2. Lack of Judicially Manageable Standards

A political question looms menacingly when a claim suffers from "a lack of judicially discoverable and manageable standards for resolving it." Baker, 369 U.S. at 217. "One of the most obvious limitations imposed by [Article III, § 1, of the Constitution] is that judicial action must be governed by standard, by rule." Vieth, 541 U.S. at 278 (plurality opinion). This is arguably the most critical factor in the political question analysis in the present litigation because at least some of the allegations would draw a court into a consideration of what constituted adequate force protection for the convoys.[4]

This factor relates most directly to our later analysis of the elements that the Plaintiffs must prove in order to prevail on their state tort claims. Consequently, our analysis under Baker is incomplete, as it is not until the final section of the opinion – where we review in some depth what the Plaintiffs must prove to prevail – that all considerations will be reviewed. What is the cart, and which is the horse, may be disputed, but we seek to get the proper analytical alignment before we are finished.

The district court found that the actions of KBR and the Army regarding the decision-making and control of the Plaintiffs' convoys were so intertwined that to question KBR's decisions is necessarily to question the Army's decisions. Fisher, 454 F. Supp. 2d at 642. In the district court's view, in order for the

---

[4] We recognize that the first and second Baker factors overlap in the circumstances presented by these cases, where military judgments are potentially subject to review. The Plaintiffs' claims, which do not directly challenge any government actor or Executive action, are far-enough removed from the type of textual commitment envisioned by Baker and its progeny to shift our primary analysis to the second factor. However, we do not suggest that the first factor is wholly irrelevant. On remand, the district court may well find that it continues to be an important consideration in these cases. Again, we are mindful that the claims need not fit neatly under a particular factor. The inextricableness of any factor will reveal the existence of a political question. Occidental, 577 F.2d at 1203.

Plaintiffs to prevail, the court would have to determine whether the Army gave sufficient information to KBR about the route the convoys were to take, whether the force protection provisions were sufficient, and whether the military personnel assigned to protect the convoys performed properly.

KBR argues that the judiciary will find no manageable standards for assessing the reasonableness of the Army's professional military judgments. The Plaintiffs stress that Army judgments are not the issue. Instead, it is argued that the fraud and negligence claims, leveled only against KBR, are uniquely suited for judicial resolution. American courts have resolved such matters between private litigants since before the adoption of the Constitution. See THE FEDERALIST NO. 80 (Alexander Hamilton). KBR does not deny that the judiciary possesses the expertise and has available the required standards to resolve ordinary fraud and negligence claims, but suggests that the unique factual setting of Plaintiffs' injuries renders these claims extraordinary.

KBR's argument and the district court's opinion rely on the fact that the relevant LOGCAP contracts and implementing Task Orders place the responsibility for force protection squarely on the Army. Warding off attacks capable of inflicting injury on these civilian truck drivers was a military duty, not a duty owed by KBR to its employees. KBR's argument in effect is that no matter how unsafe the roads of Iraq might be, KBR's assurances to potential employees could be made under the assumption that the military would provide sufficient force protection for any convoy mission.[5] A court, KBR posits, can neither ignore the Army's role in these cases nor judge whether the Army adequately performed that role.

---

[5] At oral argument, counsel for KBR suggested that only if KBR could determine that the military had breached the LOGCAP contract could it then refuse to direct its civilian employees to participate in a convoy. The only example of a demonstrable breach that counsel could provide was the military's failure to "show up at the gate" at the appointed departure time; that is, a failure to provide any force protection at all.

Evaluating this assertion by KBR requires us to understand just what the Plaintiffs must prove to prevail. We defer a detailed discussion of that until later when we review the elements of Texas tort law. The central issue will be causation. If we must examine the Army's contribution to causation, "political question" will loom large. However, the Plaintiffs have presented a plausible set of facts as to the fraud and misrepresentation claims that might allow causation to be proven under one tort doctrine without questioning the Army's role. That would occur if KBR made assurances to prospective employees that were premised on others, such as the Army, performing in a way that was unrealistic to expect or even impossible. As this court noted long ago, "[i]f the misconduct is of a character which, according to the usual experience of mankind, is calculated to afford an opportunity for the intervention of some subsequent cause, the subsequent mischief may be held to be a result of such misconduct." The Mariner, 17 F.2d 253, 254 (5th Cir. 1927). The Plaintiffs allege that they accepted employment in a war zone because KBR guaranteed that they would not be dispatched to perform work if conditions were unsafe. If KBR tortiously guaranteed safety when it knew there was no such safety, it may be liable for resulting injuries despite that the immediate causes were determined attackers that could not be thwarted by the best efforts of American defenders. These are the risks to which KBR allegedly promised not to expose the Plaintiffs. We will later discuss the tort standards for judging causation in such cases.

We now review how such claims as we just defined them might violate the second Baker factor. The factor is a recognition that "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." Japan Whaling, 478 U.S. at 230 (quoting United States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1379 (D.C. Cir. 1981)).

In Japan Whaling, the Supreme Court faced a challenge to the Secretary of State's refusal to certify that Japan's whaling practices were out of compliance

17

with an international treaty; this certification was allegedly mandated by certain congressional legislation. Id. at 224-28. The Court acknowledged "the premier role which both Congress and the Executive play in [the field of foreign relations]," but resolved the challenge nonetheless because a decision in the case "call[ed] for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below." Id. at 230. The ready availability of legal standards and the traditional role of the judiciary in interpreting statutes compelled the court to resolve the matter even while it recognized that its "decision may have significant political overtones." Id.

By contrast, the court in Cannon could find no judicial standards by which to resolve a claim that a Senator's aide was illegally paid his federal salary while engaging in campaign activity. 642 F.2d at 1375-76. Describing the suit as a "challenge to the interworkings of a Senator and his staff member," the court noted the utter absence of statutory, administrative or case law – on which courts rely on to resolve legal disputes – covering this particular matter. Id. at 1379-80. In fact, the Senate itself had failed to reach a consensus on the issue confronting the court. Id. at 1380. Under these circumstances, the court refused to resolve the dispute because doing so would "require the judiciary to develop rules of behavior for the Legislative Branch." Id. at 1385; see also Tiffany, 931 F.2d at 278-79 (refusing to craft "prudent intercept" standard for judging whether North American Air Defense Command's order to intercept potentially hostile aircraft was legally sufficient).

The cases before us are closer to Japan Whaling than Cannon or Tiffany. They primarily raise legal questions that may be resolved by the application of traditional tort standards that we discuss below. We are not asked to develop a "prudent force protection" standard and then impose that standard directly on the Army. See Tiffany, 931 F.2d at 278-79. While the resolution of Plaintiffs'

claims may require a court to adjust traditional tort standards to account for the "less than hospitable environment" in which KBR operated, the court will arguably have no need to develop any standards at all. Cf. McMahon, 502 F.2d at 1363-64. The standards for judging at least the assertions of civilian employers that cause injury to their employees are readily available.

### 3. Nonjudicial policy determination

The district court also determined that a resolution of the Plaintiffs' claims would necessarily entail a judicial pronouncement as to the wisdom of the military's use of civilian contractors in a war zone. Id. at 644.[6] As such, the court would be compelled to make a policy determination that is reserved to the discretion of the political branches, implicating the third Baker factor. Id. If that is part of the Plaintiffs' claims, then the political question doctrine does prevent resolution. For example, the Eleventh Circuit refused to entertain tort suits by Turkish sailors against the United States Navy for injuries sustained during a multi-national military training exercise because, inter alia, resolution of the suits would require the court to "render a policy determination regarding the necessity of simulating actual battle conditions." Aktepe v. United States, 105 F.3d 1400, 1404 (11th Cir. 1997). The judiciary cannot announce policy positions on military readiness for which it is neither equipped nor, more importantly, constitutionally empowered to speak.

---

[6] In its brief as amicus curiae in support of KBR, the National Defense Industrial Association stresses the importance of the combat support services that civilian contractors have long provided to the United States Armed Forces. It suggests that a decision that KBR may be liable for the Plaintiffs' injuries may deter civilian contractors from entering military-related contracts in the future. We agree that the employment of civilian contractors has proved vital to the military's maximizing its force projection. Though we make no final determinations today, if some liability ultimately is imposed, it likely would be for torts largely committed in this country during the hiring process, with damages arising in a war zone. The impact of such a result on a civilian company's willingness to contract with the military is not a factor that we may use to deny Plaintiffs a forum in federal court. See Japan Whaling, 478 U.S. at 230 ("[W]e cannot shirk this responsibility [to resolve justiciable cases] merely because our decision may have significant political overtones.").

19

To recover, the Plaintiffs may not need a court to evaluate the Executive's longstanding policy of employing civilian contractors in combat-support roles. KBR's intended defense has not been shown as legitimately implicating this broad, policy-based decision. All parties accept that the Executive acted within his discretionary authority to employ KBR to support the military mission in Iraq. The court will be asked to judge KBR's policies and actions, not those of the military or Executive Branch.

In sum, our analysis of the Baker factors convinces us that the district court will not inevitably be drawn into a reconsideration of military decisions or be forced to announce its opposition to an Executive or Congressional policy. Instead, as we discuss below, the application of traditional tort standards may permit the district court to navigate through this politically significant case without confronting a political question.

We turn now to the tort elements and attempt a "discriminating inquiry into the precise facts and posture" of these cases against KBR.

D. The Plaintiffs' Claims

We find it useful at the beginning of this final section of analysis to identify with some precision the elements Plaintiffs must prove in order to prevail on their tort claims. Ultimately, we focus our attention on causation because it is under this element that the confluence of the Plaintiffs' proof and KBR's defense presents the greatest potential for inextricableness.[7]

1. Claims and Elements

---

[7] On appeal, the Plaintiffs have focused their efforts on demonstrating that the fraud claims and "traditional personal injury claims" are justiciable. Therefore, we do not attempt to set forth the elements necessary to establish the alleged violations of federal law under 42 U.S.C. § 1983 and 18 U.S.C. § 1962(c)-(d). Still, we do not deem these claims to be waived. The district court dismissed all claims based on a lack of jurisdiction; the court did not consider the merits of any particular claim. In light of our decision today, all of the Plaintiffs' claims remain viable unless and until a "discriminating inquiry" reveals that they are, in fact, nonjusticiable under the political question doctrine.

Plaintiffs' fraud-based claims arise under Texas law. To recover for fraud in Texas, the Plaintiffs must prove: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation, and (6) the party thereby suffered injury." In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001); see also Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 185 (Tex. 1977). These elements are applicable to claims of both fraud in the inducement and intentional misrepresentation. See Haase v. Glazner, 62 S.W.3d 795, 798-99 (Tex. 2001); RenCare, Ltd. v. United Med. Res., Inc., 180 S.W.3d 160, 166 (Tex. App. 2005).

The Plaintiffs' claim of intentional or fraudulent concealment is also grounded in common law fraud. To prevail on a fraudulent concealment claim, the Plaintiffs must prove the elements of fraud that we have noted above, and that "the particular circumstances impose a duty on the party to speak and he deliberately remains silent." In re Seigel, 198 S.W.3d 21, 29 (Tex. App. 2006). In order to prove their final fraud-based claim of civil conspiracy, the Plaintiffs must show that two or more persons combined "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." Eagle Props., Ltd. v. KPMG Peat Marwick, 912 S.W.2d 825, 828 (Tex. App. 1995). "The elements of a civil conspiracy are: (1) two or more persons; (2) an end to be accomplished; (3) meeting of the minds on the end or course of action; (4) one or more overt, unlawful acts; and (5) proximately resulting in injury." Id.

With regard to their remaining claims, all Plaintiffs allege that KBR intentionally inflicted emotional distress. In order to prevail on these claims under Texas law, the Plaintiffs must show that the defendant: (1) intentionally or recklessly (2) engaged in conduct that was "extreme and outrageous" (3)

21

thereby causing the plaintiff to suffer emotional distress (4) and that distress was severe. Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606, 613 (5th Cir. 1999). The Lane Plaintiffs also allege that KBR committed negligent and grossly negligent acts. "Under Texas law, the elements of a negligence claim are (1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach." Sport Supply Group, Inc. v. Columbia Cas. Co., 335 F.3d 453, 466 (5th Cir. 2003). Gross negligence is a heightened form of negligence which requires proof of "an extreme degree of risk" and a "conscious indifference" by the negligent actor. See Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex. 1998).

### 2. Element of Causation

With the parameters of the political question doctrine and the nature and elements of the Plaintiffs' tort claims in mind, we focus on the element that is the most critical element for political question analysis – causation. The parties in their briefs appear to agree that this element presents the greatest potential for implicating the political question bar. This element is critical because we must "analyze appellant's claim as it would be tried, to determine whether a political question will emerge." Occidental, 577 F.2d at 1202. We must look beyond the complaint, considering how the Plaintiffs might prove their claims and how KBR would defend. Nonetheless, a court must satisfy itself that political question will certainly and inextricably present itself. Id.

We recognize that the district court was not presented with a focused argument regarding the significance of the causation element. Much more was presented below. For example, in the suit brought by Fisher's survivors, KBR initially moved to dismiss on the grounds that the Defense Base Act, 42 U.S.C. §§ 1651-1654, and the Federal Tort Claims Act barred the Plaintiffs suit. Later KBR renewed its motion to dismiss, arguing that it was immune from suit under the doctrines of official immunity, derivative sovereign immunity, impact-on-the-

federal-treasury immunity under Land v. Dollar, 330 U.S. 731 (1947), and the Defense Production Act of 1950, 50 App. U.S.C. § 2061 et seq. KBR also re-urged its Defense Base Act defense and argued for the first time that the Plaintiffs' claims were nonjusticiable under the political question doctrine. However, only in a third motion – a reply to the Plaintiffs' opposition to KBR's motion to dismiss – did KBR begin to focus its argument on the difficulty of proving causation without second-guessing military actions and decisions. The Plaintiffs responded (in a six-page surreply) by arguing that only KBR's actions needed to be examined in order to determine direct and proximate cause. These motions were filed only three weeks prior to the district court's final order dismissing the Plaintiffs' claims under the political question doctrine.

Only after the district court's final judgment has the broader array of defenses been laid aside, permitting the parties to sharpen their appellate arguments regarding the importance of the causation element in any political question analysis of these claims. We regret that the district court did not benefit in the first instance from these arguments, but we cannot ignore their import on appeal. Invocation of the political question doctrine implicates the district court's jurisdiction. We are "duty-bound to examine the basis of subject matter jurisdiction sua sponte, even on appeal." Union Planters Bank Nat'l Ass'n v. Salih, 369 F.3d 457, 460 (5th Cir. 2004) (reversed on jurisdictional challenge not raised until appellate reply brief). Our analysis has the benefit of arguments not presented to the district judge, which because of the nature of the issue does not invoke considerations of waiver that often would apply. We are only seeking to determine, based on all that we may consider, whether there is a plausible set of facts that supports the claim and would justify relief. Twombly, 127 S.Ct. at 1965-66.

KBR argues that no determination as to causation can be made without examining whether the Army fulfilled its contractual duty to provide force

protection for the KBR convoys. Assuming that Plaintiffs could establish all other elements of their claims, they must still demonstrate that the acts or omissions of KBR – as opposed to those of the Army or Iraqi insurgents – proximately caused their injuries. KBR has made clear that, were a trial to be held, its defense would involve the alleged inadequacy of the Army's intelligence gathering, route selection and defensive response to the attacks that actually occurred. In other words, KBR would make the case that Plaintiffs' injuries were not caused by KBR's actions or inactions, but by the insurgents' attack and the Army's failure to provide adequate protection of the convoy.

The Plaintiffs counter KBR's argument by pointing to a familiar theory of tort law that permits recovery even though another actor or cause intervenes to be the direct cause of injury. See RESTATEMENT (SECOND) OF TORTS §§ 448-449 (1965); PROSSER AND KEETON ON THE LAW OF TORTS § 44, at 303-06 (W. Page Keeton et. al., eds., 5th ed. 1987). According to the Restatement, "[i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." REST. (2D) TORTS § 449. Texas courts have applied this theory of liability in previous cases. See Nixon v. Mr. Prop. Mgmt., 690 S.W.2d 546, 549 (Tex. 1985); Kimbriel Produce Co. v. Mayo, 180 S.W.2d 504, 507 (Tex. Civ. App. 1944); see also Engle v. Dinehart, No. 99-10087, 2000 WL 554942, **11-12 (5th Cir. April 19, 2000) (unpublished) (noting that Texas courts have adopted the causation theory embodied in Sections 448 and 449 of the Restatement); cf. Sheridan v. United States, 487 U.S. 392, 398 (1988) (interpreting Federal Tort Claims Act) ("[I]n at least some situations the fact that an injury was directly caused by an assault or battery will not preclude liability against the Government for negligently allowing the assault to occur.").

The comments to Section 449 elaborate on this theory of causation:

24

The happening of the very event the likelihood of which makes the actor's conduct negligent and so subjects the actor to liability cannot relieve him from liability. The duty to refrain from the act committed or to do the act omitted is imposed to protect the other from this very danger. To deny recovery because the other's exposure to the very risk from which it was the purpose of the duty to protect him resulted in harm to him, would be to deprive the other of all protection and to make the duty a nullity.

REST. (2D) TORTS § 449, cmt. b.[8] Although couched in terms of negligence, this theory of causation is applicable to intentional torts as well. Id. at § 870, cmt. l.

Applying the Restatement approach to the events leading to the Plaintiffs' injuries and bearing in mind our standard for reviewing a Rule 12(b)(1) dismissal, we cannot say that all plausible sets of facts that would permit the recovery from KBR would also raise a political question. The Plaintiffs and KBR were not strangers in Iraq, possessing no duties to each other. The Plaintiffs were in Iraq as employees of KBR and, more particularly the Plaintiffs allege, because KBR had drawn them there with explicit representations of safety. Assuming, as we must, that Plaintiffs' allegations are true, KBR might be seen as making representations as to safety knowing it likely that the Government could not provide the assured risk-free environment. Causation would exist if KBR's misrepresentations were a cause in fact of the Plaintiffs' ultimate injuries. See Nixon, 690 S.W.2d at 549 ("Cause in fact denotes that the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred.").

Under this theory of causation, the district court may be able to resolve the Plaintiffs' fraud and negligence claims under Texas tort law without second-guessing the acts and decisions of the Army. The court would be asked to determine whether KBR made assurances to the Plaintiffs about conditions in

---

[8] The Reporter's Notes to Section 449 cite Jesse French Piano & Organ Co. v. Phelps, 105 S.W. 225 (Tex. Civ. App. 1907), as authority for the last two sentences of Comment b.

Iraq which KBR knew or should have known were untrue. This determination may very well require a review of the information KBR received from the Army, understanding also when it was received. The question would be what KBR did after receiving the information, not how ably the military gathered or interpreted it. The Plaintiffs do not allege that the Army guaranteed their safety; they allege KBR did. Therefore, the court may not have to inquire into the adequacy of the Army's intelligence and planning to determine whether, based on the information it possessed, KBR made misrepresentations or breached a duty to its employees.

For example, the Plaintiffs might prove that, based on the intelligence provided to KBR by the military and collected by KBR's own employees, that KBR knew or should have known at the time that it was recruiting the Plaintiffs to work for KBR in Iraq that the situation was likely to be so hostile that KBR could not reasonably believe that its employees would be "100% safe." Similarly, later in Iraq when the April 2004 convoys were about to roll out, KBR might be shown to have known of the likelihood of danger and that KBR had assumed a duty to its employees not to proceed in such circumstances. The evidence may instead reveal that, based on the information available to KBR, it did not make any fraudulent misrepresentations or that it did not have any duty to the Plaintiffs that was breached. Under either scenario, the cases might be triable without raising a political question because the court could assess KBR's liability by simply being aware of the information the military provided to KBR, not second-guessing that information.

Proving KBR's negligent breach of a duty in Iraq not to allow a convoy to proceed if conditions were too dangerous will involve rather different evidence than would proof of misrepresentations made during hiring or later about safety. Though the causation analysis applies to both issues, at some point the political question analysis between the two will likely diverge. The Plaintiffs' negligence

allegations move precariously close to implicating the political question doctrine, and further factual development very well may demonstrate that the claims are barred. However, like the fraud claims, we cannot say at this point that negligence claims necessarily implicate the political question doctrine.

Distinguishable from political question concerns is the fact that a trial might require the use of classified information. As the district court in this case has already demonstrated, federal courts are capable of evaluating sensitive or privileged information in camera and providing other needed protections.

### 3. Cases relied on by the District Court

In reaching its conclusion that Plaintiffs' claims were barred by the political question doctrine, the district court relied on two other district court opinions that barred tort suits against private contractors operating in a war zone. See Smith v. Halliburton, No. 4:06-cv-00462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) (unpublished); Whitaker v. Kellogg Brown & Root, 444 F. Supp. 2d 1277 (M.D. Ga. 2006).[9] Among the distinctions we find significant, in Smith the injuries occurred inside a military base in Iraq after a suicide bomber penetrated security checkpoints operated solely by the military. Smith, 2006 WL 2521326, at **4-6. Whitaker involved a claim by an American soldier against private contractors whom he was ordered to escort in Iraq. 444 F. Supp. 2d at 1279, 1281 n.4.[10] There are other recent precedents that find tort claims against civilian contractors performing support services in a war zone do not necessarily raise nonjusticiable political questions. See McMahon, 502 F.3d at 1357-65; Carmichael v. Kellogg, Brown & Root Servs., 450 F. Supp. 2d 1373,

---

[9] These decisions were not appealed.

[10] Of course, the political branches have long-provided "simple, certain and uniform compensation" for members of the armed forces who suffer service-related injuries. See United States v. Johnson, 481 U.S. 681, 688-90 (1987) (citing the Veterans' Benefits Act, codified as amended at 38 U.S.C. § 301 et. seq).

1374-76 (N.D. Ga. 2006); Potts v. Dyncorp Int'l, LLC, 465 F. Supp. 2d 1245, 1248-54 (M.D. Ala. 2006); cf. Ibrahim v. Titan Corp., 391 F. Supp. 2d 10, 15-16 (D.D.C. 2005) ("An action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve the courts in 'overseeing the conduct of foreign policy or the use and disposition of military power.'") (quoting Luftig v. McNamara, 373 F.2d 664, 666 (D.C. Cir. 1967)).

In summary, different cases involving different claims require their own discriminating inquiry under Baker.

## III. CONCLUSION

We recognize the difficulty presented by cases that arise at least in part in a war zone. There are constitutional as well as practical considerations that may prevent judicial resolution. It appears, though, that these tort-based claims of civilian employees against their civilian employers can be separated from the political questions that loom so large in the background.

The district court already has exhibited a willingness to make a discriminating inquiry into the facts and applicable legal standards. This court on appeal has had the advantage not available below of the parties' sharpened focus on the legal requirements of the torts on which these claims are based. That focus has revealed that it may be possible to resolve the claims without needing to make a constitutionally impermissible review of wartime decision-making. It is conceivable that further development of the facts on remand will again send this case toward the political question barrier. Permitting this matter to proceed now does not preclude the possibility that the district court will again need to decide whether a political question inextricably arises in this suit. The litigation is not yet there, if it ever will be.

REVERSED and REMANDED for proceedings consistent with this opinion.