LAMAR, Justice,
dissenting:
¶29. I agree with the majority that Plaintiffs liability theories are based on simple negligence by Mid-South in the construction of the ballistic wall. And I agree that the resolution of that issue would not require an evaluation of military decisions. But, although Plaintiff does not challenge military decisions, Mid-South has raised defenses concerning proximate causation and comparative negligence that will require the fact-finder to evaluate decisions and training strategies of the military, thus presenting a nonjusticiable issue. Questions of justiciability must be resolved before one reaches the merits of the case. The issue we must decide is whether Defendants have presented enough evidence to present a jury question as to whether the military decisions contributed to S02 Ghane’s death.
¶ 30. I include some additional facts that I believe are helpful to understanding this case. Although the Navy had regulations covering the design of ballistic walls at the time the current walls were designed and constructed, the SEALS never instructed Mid-South on how it should construct the walls, nor did they inform Mid-South of any standards the walls should meet. When the SEALS trained at Mid-South, they were under the control of their training cadre, and the Mid-South instructors had no oversight, except for shooting and weapons-handling instructions at the outdoor ranges. The SEALS brought their own equipment, weapons, and ammunition. They also had their own armorer to repair weapons and select ammunition. Navy range safety officers (RSOs) oversaw the close-quarter combat (CQC) training, determined target placement, and controlled the manner in which the SEALS entered the shoothouses. Sanders testified that the RSOs were required to inspect the shoothouses every day and determine that the conditions were safe for the SEALS to train.
¶ 31. In January 2008, SEALS Team 5, including S02 Ghane, traveled to Mid-South to conduct a training cycle. During the January 2008 training cycle, the SEALS armorer selected 5.56 mm “green-tip” rounds to be used for training exercises instead of less powerful “black-tip” or “blue tip” rounds normally used for training. On January 30, 2008, the SEALS were training in the shoothouses, practicing room-clearing. The RSO placed a hostile target on one side of an interior ballistic wall, while the SEALS were “stacked” on the other side.of the wall. This resulted in the SEALS who had moved around the wall shooting back at a target on the wall directly in front of the SEALS waiting to enter the room. According to Shaw, this was not standard Navy practice, and a Navy Master Chief expressly had instructed the RSO a few days before January 30 not to put any SEALS behind walls that were being shot at.
¶ 32. The Investigating Officer also included the following conclusion and recommendation in his report summary:
Recommend that no charges be brought against the TRADET safety officers on the scene. The ultimate cause of S02 Ghane’s tragic death stems from defective walls that were not ballistic as advertised and paid for in this case. While *224 multiple factors, including the weather, ammunition, and tactics may have played a role, Navy Special Warfare’s inability to detect that the ballistic shoot house was not designed, built, maintained, or tested based on formal objective standards was a systemic and critical failure. This oversight began the first time any Naval Special Warfare unit used the current shoot house walls approximately six years ago and continued until January 80, 2008. As such, the Naval Special Warfare shares a collective responsibility in this case.
(Emphasis added.)
¶ 33. The commanding officer of NSWC, G.J. Bonelli, transmitted the report via letter dated June 26, 2008, to the Commander, Naval Special Warfare Group One. In that letter, Bonelli endorsed and approved the report, subject to certain comments. Bonelli’s comments included the following:
a. An unfortunate combination of events, to include the misplaced reliance on the integrity of what was thought to be a ballistic wall, the practice of [redacted] and the use of [redacted] ammunition were variables in this fatal mishap. The exercise of stronger Operational Risk Management (ORM) procedures may have identified a weakness in the risk mitigation that could have been further addressed on the spot on the date of the mishap.
b. Recommendation 6 seeks a study of the use of [redacted] ammunition in [redacted] both in training and in combat. My staff and I have looked at this recommendation and I decline to impose an absolute bar on its use. We need to train how we will fight. I accord deference to the combatant commanders in the types of ammunition they believe the war-fighters need in theater. That said, we need to carefully evaluate each and every occasion where we train with the [redacted] ammunition.
(Emphasis added.) In other words, Bonel-li’s recommendation was to allow combatant commanders discretion in choosing which ammunition to train with because the SEALS need to “train how they will fight,” even if some ammunition and/or training tactics are more dangerous than others.
¶ 34. While complaints against government contractors rarely implicate a political question directly, “military decisions that are textually committed to the executive sometimes lie just beneath the surface of the case.”[9] It is critical that the court consider not only a plaintiffs claim, but also the defenses that will be presented. The Third Circuit Court of Appeals has explained a court’s task in such a case as follows:
In these situations, the political question appears not from the plaintiffs complaint, but from the broader context made relevant by a contractor’s defenses. As such, to avoid infringing on other branches’ prerogatives in war-time defense-contractor cases, courts must apply a particularly discriminating inquiry into the facts and legal theories making up the plaintiffs claims as well as the defendant’s defenses.[10]
¶ 35. The Third Circuit Court of Appeals recently addressed the political-question doctrine in a case involving claims against a government contractor in Harris *225 v. Kellogg, Brown & Root Servs., Inc.[11] The court recognized that, while “military control over a contractor’s actions is one common way that evaluation of military decisions becomes necessary,” the court’s inquiry does not end there, because “[pjlaintiff s claims might still present un-reviewable military decisions if proving those claims or ... defenses necessarily requires evaluating such [military] decisions.” [12]
¶ 36. In such cases, when “analyzing whether a proposed defense implicates a nonjusticable political question ... courts must first decide whether the defendant has ‘presented sufficient evidence to permit a jury to conclude that he established the [elements of the] defense by a preponderance of the evidence.’ ”[13] If there is sufficient evidence to support the defense, and the defense introduces a nonjusticiable issue, then the case must be dismissed.[14] As the court explained in regard to proximate cause:
If a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticia-ble issue. In such a system, there is simply no way to determine damages without evaluating military decisions. The fact finder cannot decide the respective degrees of fault as between a military contractor like KBR and the military without evaluating the decisions made by each .... [15]
¶ 37. The Fifth Circuit Court of Appeals also addressed the political-question doctrine in the context of claims against a private government contractor in Lane v. Halliburton,[16] On appeal, the court explained that, “[w]e must look beyond the complaint, considering how the [Plaintiffs might prove their claims and how [defendant] would defend. Nonetheless, a court must satisfy itself that political question will certainly and inextricably present itself.” [17]
¶38. The Fifth Circuit explained that “[t]he central issue will be causation. If we must examine the Army’s contribution to causation, ‘political question’ -will loom large.”[18] In Lane, the court determined that it could not “say that all plausible facts that would permit the recovery from [defendant] would also raise a political question” and remanded the ease for further proceedings.[19] The court concluded, “the case needs further factual development before it can be known whether the doctrine is actually an impediment,” and made clear that “[p]ermitting this matter to proceed now does not preclude the possibility that the district court will again need to decide whether a political question inextricably arises in this suit.”[20]
¶ 39. In this case, the trial court found that causation would be an issue for each of Plaintiffs causes of action and that the “fact finder will be required to evaluate decisions made by the Navy such as the placement of targets, how the soldiers would conduct their exercises, the ammu *226 nition, the orders of the Navy as to the building and maintenance and building of the walls of the shoothouse, and continuing the training after allegations that the walls had been breached earlier in making a determination of causation and comparative fault.”[21] The trial court further found that it “has a lack of judicially discoverable and manageable standards for resolving this case at least as to the fault of the military.” I agree.
¶ 40. It is well-settled that an accident can have more than one proximate cause.[22] In this case, each of Plaintiffs claims involves a question of causation.[23] Defendants asserted the affirmative defense of comparative negligence in their answer and have made very clear that they intend to defend on the basis that the Navy SEALS’ negligence contributed at least in part to S02 Ghane’s death, as they are entitled to do under' Mississippi law, whether Plaintiff has alleged that Navy practices contributed to his death or not.[24] I would find that Mid-South has presented sufficient evidence to support its defense, as the SEALS’ own investigation into S02 Ghane’s death concluded that the SEALS bore at least some responsibility.
¶ 41. The issue we must decide in this case is not whether Defendants have proven that military decisions actually did cause or contribute to S02 Ghane’s death; rather, the issue is whether Defendants have presented enough evidence to present a jury question regarding whether military decisions contributed to S02 Ghane’s death. The majority finds that Defendants “have failed to demonstrate that the military’s training tactics — such as S02 Ghane’s position in the shoothouse, the placement of targets, and the choice of ammunition — exceeded the scope of what Mid-South represented its facility could handle. Military policy and training tactics are therefore irrelevant for purposes *227 of causation.” Maj. Op. at ¶ 21. On the record before us, there are questions of fact regarding the extent of Mid-South’s representations concerning the ballistic capacity of the wall, whether the failure of the wall was the sole cause of S02 Ghane’s death, and whether the training decisions made by the Navy contributed to S02 Ghane’s death.[25] In other words, there are jury questions present in this case regarding causation. Although the presence of a jury question prevents a grant of summary judgment in the vast majority of cases, in this case, as the majority recognizes, if a jury is “tasked with apportioning percentage of fault between the Navy and defendants,” the jury would “inevitably be required to reexamine military decisions ....” Maj. Op. at ¶20. It is this reexamination that is prohibited by the political question doctrine and requires dismissal of Plaintiffs claims.
¶ 42. In a proportional-liability jurisdiction such as Mississippi, there “is simply no way” for a fact-finder to determine liability and percentages of comparative fault between the Navy and Mid-South without analyzing decisions made by each — specifically, the Navy’s decisions with respect to training tactics, ammunition used, and inspection of training facilities.[26] For these reasons, I would affirm the trial court’s order granting Defendants’ motion for summary judgment based on the political-question doctrine.
WALLER, C.J., AND COLEMAN, J., JOIN THIS OPINION.

. Harris v. Kellogg, Brown & Root Servs., Inc., 724 F.3d 458, 465 (3d Cir.2013).

. Id. at 466 (citing Lane v. Halliburton, 529 F.3d 548, 565 (5th Cir.2008)).

. Harris, 724 F.3d 458.

. Id. at 467.

. Id. at 469 (citing United States v. Stewart, 185 F.3d 112, 125 (3rd Cir.1999)).

. Harris, 724 F.3d at 469.

. Id. at 474.

. Lane, 529 F.3d 548.

. Id. at 565 (citation omitted) (emphasis in original).

. Id. at 561.

. Id. at 566-687, 568.

.Id. at 554, 568.

. On January 28, 2008, Mid-South was notified about a bullet possibly penetrating one of the shoothouse walls. Sanders testified that he and the RSO inspected the wall, but could not find any evidence of penetration. However, out of an abundance of caution, the wall was taken out of service.

. Hill v. Columbus Ice Cream & Creamery Co., 230 Miss. 634, 93 So.2d 634, 641-42 (1957) ("there may be more than one proximate cause of an accident”).

. See Mladineo v. Schmidt, 52 So.3d 1154, 1162 (Miss.2010) ("elements of a negligence claim are duty, breach of duty, proximate cause, and damages”); Huynh v. Phillips, 95 So.3d 1259, 1262 (Miss.2012) (plaintiff must show that the defendant exclusively controlled the instrumentality causing damage); Waggoner v. Williamson, 8 So.3d 147, 155 (Miss.2009) (negligent-misrepresentation claim requires proof of damages as a "direct and proximate result” of reliance on a misrepresentation of material fact); Double Quick, Inc. v. Moore, 73 So.3d 1162, 1166 (Miss.2011) (to recover in a premises-liability action, plaintiff must show damages, breach of duty, and that the breach was a proximate cause of the damages); Palmer v. Anderson Infirmary Benevolent Ass'n, 656 So.2d 790, 796 (Miss.1995) (negligence per se requires plaintiff to prove proximate causation); J.R. ex rel. R.R. v. Malley, 62 So.3d 902, 906-07 (Miss.2011) (negligent infliction of emotional distress requires proof that plaintiff suffered distress as a direct result of defendant’s actions); Koury v. Ready, 911 So.2d 441, 445 (Miss.2005) (fraud requires proof of proximate causation); Miss. Code Ann. § 11 — 1—63(a)(iii) (Rev.2002) (products liability claim requires proof of causation); Davis v. McGuigan, 325 S.W.3d 149, 161-162 (Tenn.2010) (claim under the Tennessee Consumer Protection Act requires proof of a loss of money or property as the result of an unfair or deceptive practice).

.See Miss.Code Ann. § 85-5-7 (Rev.2011); Miss.Code Ann. § 11-7-15 (Rev.2004); Fielder v. Magnolia Beverage Co., 757 So.2d 925, 933 (Miss. 1999) (Mississippi law allows for determination of percentage of fault in a civil case).

. Many of the facts related in our opinion come from the Navy’s investigative report and the depositions of Defendants. I note that the facts recited and conclusions reached by the Navy and Defendants have not been stipulated to, and a jury must consider and is free to give whatever weight it deems appropriate to the evidence presented. In re Extension, Enlarging of Boundaries of City of Laurel, 922 So.2d 791, 796 (Miss.2006) (“It is the sole responsibility of jurors to consider and weigh the evidence presented.”). I stress that my conclusion that this case must be dismissed due to the political-question doctrine is not a conclusion that military decisions did in fact contribute to S02 Ghane’s death, but is instead a conclusion that Defendants have presented enough evidence to raise a jury question regarding whether military decisions contributed to S02 Ghane’s death. Indeed, a jury might very well conclude that military practices played no part in S02 Ghane’s death. However, the political-question doctrine prohibits jury consideration of military decisions.

. Harris, 724 F.3d at 474.