**Sgt. Mark McMANAWAY,
et al., Plaintiffs,**

v.

**KBR, INC., et al., Defendants.**

**Civil Action No. H–10–1044.**

United States District Court,
S.D. Texas,
Houston Division.

Dec. 4, 2012.

David J. Cutshaw, Takeena Monette Thompson, Gabe A. Hawkins, Melissa Louise Stuart, Cohen and Malad, Indianapolis, IN, Matthew S. Finkelstein, Michael P. Doyle, Patrick Mason Dennis, Doyle Raizner LLP, Houston, TX, for Plaintiffs.

Geoffrey L. Harrison, Chanler Ashton Langham, James Hoke Peacock, III, Susman Godfrey LLP, Houston, TX, for Defendants.

## *ORDER*

VANESSA D. GILMORE, District Judge.

Pending before the Court is the KBR Defendants' Motion to Dismiss Plaintiffs' Seventh Amended Complaint under Rule 12(b)(1) and Rule 12(b)(6), filed on March 30, 2012 (**Instrument No. 217**). On August 16, 2012, the Court entered an Order denying Defendants' Motion (**Instrument No. 392**). That Order (**Instrument No. 392**) is revised to clarify the legal standard employed by the Court in reviewing the motion to dismiss. Now, the Court directs the Clerk's Office to replace the August 16th Order (**Instrument No. 392**) with the Order below.

658

Plaintiffs are soldiers from the Indiana National Guard, the West Virginia National Guard, and the British Royal Air Force. Defendants are comprised of two groups: the Halliburton Defendants, and the KBR Defendants. The Halliburton Defendants are Halliburton Company ("Halliburton Co.") and Halliburton Energy Services, Inc. ("HESI") (collectively the "Halliburton Defendants" or "Halliburton"). The KBR Defendants are KBR, Inc., Kellogg Brown & Root Services, Inc., KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc. (collectively the "KBR Defendants" or "KBR"). In 2003, during the time period at issue in this case, Halliburton Co. was the parent company of HESI, KBR, Inc., Kellogg Brown & Root Services, Inc., KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc, all of its co-defendants in this case. (Instrument No. 234, Ex. A at 2). Sometime after 2003, the Halliburton Defendants and the KBR Defendants separated, and Halliburton Co. ceased being the parent company of KBR, Inc., Kellogg Brown & Root Services, Inc., KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc.

The instant dispute stems from Plaintiffs' exposure to sodium dichromate, a chemical used to treat water in oil wells, at the Quarmat Ali water treatment plant in Iraq. The powder form of sodium dichromate is orange-yellow. When mixed with water, sodium dichromate acts as an anti-corrosive agent. Sodium dichromate is also known to be an irritant and a substance that can cause cancer.

In 2003, Plaintiffs provided military protection and escorts to civilian teams that were working to restore operations at Quarmat Ali. The restoration work was part of Project Restore Iraqi Oil ("RIO"), the United States government's efforts to restore oil production facilities in Iraq. In March of 2003, the United States Army Corps of Engineer ("USACE") contracted with Kellogg Brown & Root, Inc., then a subsidiary of Halliburton Co., to implement Project RIO. Task Order 3 of the contract specified that KBR was to restore operations at Quarmat Ali.

Plaintiffs filed suit against KBR and Halliburton on March 31, 2010. (Instrument No. 1). Their seventh amended complaint against KBR and Halliburton was filed on July 6, 2011. (Instrument No. 110). In their seventh amended complaint, Plaintiffs allege that they were injured by their exposure to sodium dichromate at Quarmat Ali. They bring claims against KBR and Halliburton for negligence, gross negligence, fraud and intentional infliction of emotional distress.

Specifically, Plaintiffs allege that KBR and Halliburton understood and disregarded the danger of wholesale site contamination by sodium dichromate. (Instrument No. 110 at 6, 18). Plaintiffs began suffering from continuous bloody noses; spitting up of blood; coughing; irritation of the nose, eyes, throat, and lungs; and shortness of breath. (Instrument No. 110 at 22). When Plaintiffs complained, KBR and Halliburton managers told them the symptoms were an effect of the "dry desert air" and caused by sand allergies. (Instrument No. 110 at 6–7). Despite this, Plaintiffs allege that KBR and Halliburton knew that blood testing of civilians exposed to the sodium dichromate onsite confirmed elevated chromium levels. (Instrument No. 110 at 7, 9). Since returning from Iraq, Plaintiffs have manifested various illnesses they allege are connected to their exposure to sodium dichromate, including respiratory system tumors, chemical sensitivities, and rashes. (Instrument

No. 110 at 7). Two Plaintiffs have died. (Instrument No. 110 at 7).

KBR filed the instant motion to dismiss Plaintiffs' seventh amended complaint on April 6, 2012. (Instrument No. 217). The Halliburton Defendants joined in KBR's motion on April 4, 2012. (Instrument No. 220). KBR and Halliburton argue that Plaintiffs' claims should be dismissed because they are barred by the political question doctrine and the combatant activities exception of the Federal Tort Claims Act ("FTCA"). Plaintiffs responded to the motion to dismiss on April 24, 2012. (Instrument No. 268). KBR filed a Reply on May 14, 2012. (Instrument No. 273). In addition, KBR filed a notice of additional authority and a supplement to their motion on July 17, 2012. (Instrument Nos. 377, 378).

## I.

### A.

■ "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir. 1998). A district court may dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure Rule 12(b)(1) on any one of three separate bases: (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. U.S.,* 281 F.3d 158, 161 (5th Cir.2001) (citing *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996)). In examining a Rule 12(b)(1) motion, the courts are empowered to consider matters of fact which are in dispute. *See Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981). When the court's sub-

ject matter jurisdiction is challenged, the party asserting jurisdiction bears the burden of establishing it. *See Gaar v. Quirk,* 86 F.3d 451, 453 (5th Cir.1996). Any uncontroverted facts in the complaint must, however, be accepted as true. *See Gaubert v. United States,* 885 F.2d 1284, 1285 (5th Cir.1989), *rev'd on other grounds,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (citing *Gibbs v. Buck,* 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939)). Moreover, the court must construe the complaint broadly and liberally. *See Gaubert,* 885 F.2d at 1285 (citing *Norton v. Larney,* 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413(1925)).

■ When a Rule 12(b)(1) is filed in conjunction with other Rule 12 motions, the court should usually consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *See Ramming,* 281 F.3d at 161. This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice. *See id.* The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction. *See Id.*

A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction should be granted only if it appears that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *See Id.* (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998)).

### B.

■ Under Rule 8 of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled

to relief." Fed.R.Civ.P. 8(a)(2). The complaint need not contain "detailed factual allegations," but it must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Likewise, a complaint that articulates "naked assertions devoid of further factual enhancement" is similarly insufficient to satisfy the pleading requirements of Rule 8. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (internal punctuation omitted).

■ When a complaint does not meet the pleading requirements of Rule 8, Rule 12(b)(6) authorizes dismissal of a civil action for "failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). To survive a motion to dismiss, the complaint must articulate "the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir.2007). Stated otherwise, in order to withstand a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir.2011). A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir.2010). A claim

for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. This "plausibility standard is not akin to a probability requirement, but asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (internal quotations omitted). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955.

■ Under this rubric, dismissal is proper only if the plaintiff's complaint: (1) does not include a cognizable legal theory, *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001), or (2) includes a cognizable legal theory but fails to plead enough facts to state a claim to relief that is plausible on its face, *Pleasant*, 663 F.3d at 775; *see also Frith v. Guardian Life Ins. Co.*, 9 F.Supp.2d 734, 737–38 (S.D.Tex. 1998) (Gilmore, J.) (holding that dismissal pursuant to Rule 12(b)(6) "can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory").

■ When ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir.2011) (internal citations and quotations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The Court does not resolve any disputed fact issues. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Instead, the Court assumes all well-pleaded facts contained in the com-

plaint are true. *Wolcott,* 635 F.3d at 763. The Court will not, however "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Great Lakes Dredge & Dock Co. LLC v. La. State,* 624 F.3d 201, 210 (5th Cir.2010). Similarly, legal conclusions masquerading as factual conclusions need not be treated as true. *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995); *see also Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Although all well-pleaded facts are viewed in the light most favorable to the plaintiff, *Turner,* 663 F.3d at 775; *Gonzalez v. Kay,* 577 F.3d 600, 603 (5th Cir.2009), the Court "will not strain to find inferences favorable to the plaintiff." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir.2008) (internal citations and quotations omitted). Therefore, "to avoid a dismissal for failure to state a claim, a plaintiff must plead specific facts." *Dorsey,* 540 F.3d at 338.

▮▮▮▮ That said, "motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232 (5th Cir.2009) (citation omitted). Given the harshness of dismissal, the Court will generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir.2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.,* 363 F.3d 398, 403 (5th Cir.2004) ("Leave to amend should be freely given.") (internal citations omitted).

## II.

KBR argues that Plaintiffs' claims should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure be-cause they raise a political question. KBR also argues that Plaintiffs' claims should be dismissed under Rule 12(b)(1) or Rule 12(b)(6) of the Federal Rules of Civil Procedure because they fall under the combatant activities exception in the Federal Tort Claims Act ("FTCA").

## A.

▮▮▮ Under the political question doctrine, certain matters may be deemed to be nonjusticiable. *Lane v. Halliburton,* 529 F.3d 548, 557 (5th Cir.2008). "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). The Supreme Court has provided six factors for determining whether a political question is present: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Vieth v. Jubelirer,* 541 U.S. 267, 277, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004); *Lane,* 529 F.3d at 558. "Unless one of these formulations is *inextricable* from the case at bar, there should

be no dismissal on the ground of a political question's presence." *Baker*, 369 U.S. at 217, 82 S.Ct. 691 (emphasis added).

■ KBR argues that five of the six factors identified by the Supreme Court in *Baker* apply here: factors 1, 2, 3, 4 and 6. KBR's argument stems from the position that their role in the sodium dichromate exposure that occurred at Quarmat Ali cannot be evaluated without second-guessing the decisions of the United States military. According to KBR, this is because the United States military played "an unavoidably central and pervasive role" in the sodium dichromate exposure that occurred. (Instrument No. 217 at 16).

Before applying the *Baker* factors, the Court first considers whether the instant record supports KBR's position. As previously stated, KBR agreed to restore water treatment operations at Quarmat Ali under Task Order 3 of the Project RIO contract between KBR and the United States Army Corps of Engineers ("USACE"). Task Order 3 provided that the U.S. military was responsible for evaluating and declaring a site as "benign" before KBR operations would begin at the site. The Task Order stated: "An Iraq Oil Infrastructure facility shall be considered benign and ready for a contractor if the following conditions are met: ... Facility has been cleared of all enemy forces, environmental hazards, (NBC and industrial), mines, unexploded ordnance, booby-traps, and sabotage systems." (Instrument No. 217–9 at 3). The sodium dichromate at Quarmat Ali was toxic, present in the environment, and used to treat water for oil well operations. It was thus an environmental and industrial hazard. Because the definition of "benign" in the Task Order included the condition that the site be "cleared of all ... environmental hazards (NBC and industrial)," the definition provides support for the conclusion that the U.S. military, rather than KBR, was responsible for evaluating sodium dichromate hazards at Quarmat Ali.

However, Task Order 3 also stated that, "once benign conditions are established ... [c]ontractor personnel shall assist in the ... damage assessment of the Iraq Oil Infrastructure." (Instrument No. 217–9 at 3). In addition, the Environmental Protection section of Task Order 3 stated that "initial assessments need to document (photographically, etc.) the condition of sites relative to pre-existing conditions.... More detailed evaluation (e.g. analyses of samples of environmental media) may be pursued if visual evidence, likely site history (i.e. past use coupled with process knowledge), etc. warrant." (Instrument No. 217–9 at 6). The Environmental Protection section also stated: "Environmental protection matters shall be coordinated with the PCO [Procuring Contracting Officer] or designated representative and Commander responsible for the AO [Area of Operations]." (Instrument No. 217–9 at 6). A later section of Task Order 3, titled "Establish Initial Facility Operational Control," stated: "The Contractor shall provide technical and operational support necessary to limit safety and environmental damage immediately following hostilities, and to facilitate responsive documentation and reporting of system condition and capabilities." (Instrument No. 217–9 at 9). Finally, Task Order 3 also stated that "[t]he Contractor shall establish a safety and health program." (Instrument No. 217–9 at 7). These further statements in Task Order 3 regarding environmental, health and safety issues at Quarmat Ali show that regardless of whether the military was responsible for assessing sodium dichromate hazards at Quarmat Ali prior to KBR's arrival, KBR had significant responsibility for assessing and responding

to sodium dichromate hazards at Quarmat Ali once it was on site.

Furthermore, KBR's conduct at Quarmat Ali shows that KBR played a significant role in assessing and responding to sodium dichromate hazards at Quarmat Ali. For example, in July 2003, KBR took soil samples and determined that the yellow/orange coloration in the soil was sodium dichromate. (Instrument No. 217, Ex. 11). KBR also tested its employees for the presence of chromium in their blood and urine. (Instrument No. 217, Ex. 11). In August 2003, KBR representatives informed USACE of sodium dichromate contamination at Quarmat Ali and began implementing protective measures, such as hiring a subcontractor to encapsulate and cover contaminated soil. *See* (Instrument No. 217–8 at 25; Instrument No. 377–2 at 16).

As evidence of the military's involvement at Quarmat Ali, KBR points to an internal investigation conducted by the U.S. Army. The investigation found that, at around the same time that KBR began to suspect sodium dichromate contamination at Quarmat Ali, USACE also became aware that sodium dichromate was present at the facility. (Instrument No. 377–2 at 17). According to the investigators, USACE responded to the presence of sodium dichromate by recommending on-site safety measures to KBR, performing safety/hazard briefings, and notifying other personnel involved with Project RIO of the potential hazard. (Instrument No. 377–2 at 17). Nonetheless, although the investigators identified a number of actions taken by USACE, they also identified many actions taken by KBR rather than USACE. The investigative report states: "As KBR began to suspect sodium dichromate presence, it gathered Material Safety Data Sheets (MSDSs), instituted access restrictions, conducted additional investigations, developed decontamination and remediation measures, notified USACE of suspected presence, and began testing." (Instrument No. 377–2 at 4). The report thus confirms that KBR played a significant role in assessing and responding to sodium dichromate hazards at Quarmat Ali.

Much of the evidence in the record runs counter to KBR's position that the U.S. military played a central and pervasive role in the sodium dichromate exposure that occurred at Quarmat Ali. Under Task Order 3, KBR had a great deal of responsibility for assessing and responding to sodium dichromate issues. Furthermore, KBR's actions show that it played a significant role in assessing and responding to sodium dichromate issues. As the record stands, the performance of KBR's obligations regarding environmental and safety issues under Task Order 3 may be evaluated separately from the military's decision to include the restoration of Quarmat Ali in Task Order 3 and the military's decisions in carrying out the restoration of Quarmat Ali. With this separability in mind, the Court turns to the *Baker* factors.

**1.**

■ The first *Baker* factor is a textually demonstrable constitutional commitment of the issue to a coordinate political department. *Baker,* 369 U.S. at 217, 82 S.Ct. 691. The Constitution commits to the Executive the responsibility of commanding the military. U.S. Const. art. II, § 2. Thus, cases that challenge military commands raise political questions that are not fit for judicial resolution. *Lane,* 529 F.3d at 559–60. Examples of cases that implicate the textually demonstrable commitment of constitutional authority to the Executive branch include a challenge to the President's decision to deploy troops abroad, or a suit seeking judicial oversight of training procedures employed by the National Guard. *See id.* at 560 (citing

*Johnson v. Eisentrager,* 339 U.S. 763, 789, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); *Gilligan v. Morgan,* 413 U.S. 1, 5–10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973)). The Fifth Circuit has stated, based on cases such as *Johnson* and *Gilligan,* that the textually demonstrable commitment factor primarily concerns direct challenges to actions taken by a coordinate branch of the federal government. *Id.*

As discussed above, the U.S. military sought to have KBR restore operations at Quarmat Ali under Task Order 3 of the Project RIO contract. Under Task Order 3, the military was responsible for detecting sodium dichromate contamination at Quarmat Ali prior to KBR's arrival. In addition, after KBR was on site, the military was involved in detecting and responding to sodium dichromate issues at Quarmat Ali. However, KBR had a great deal of responsibility for assessing and responding to sodium dichromate hazards at Quarmat Ali under Task Order 3. KBR also played a significant role in assessing and responding to sodium dichromate hazards at the site. KBR's actions may thus be evaluated without second-guessing the military's decision to restore Quarmat Ali, or the military's decisions in carrying out the restoration. This case concerns challenges to actions taken by KBR, rather than by the U.S. military. Plaintiffs' claims do not implicate military decisions that have been committed by the Constitution to the authority of the Executive branch. The first *Baker* factor, of a textually demonstrable constitutional commitment of the issue to a coordinate political department, is therefore not present.

**2.**

The second *Baker* factor is a lack of judicially discoverable and manageable standards for resolving the issue. *Baker,* 369 U.S. at 217, 82 S.Ct. 691. Plaintiffs bring four tort claims against KBR and Halliburton: negligence, gross negligence, fraud, and intentional infliction of emotional distress against KBR and Halliburton. The issue here is whether these claims may be resolved under traditional tort standards, or whether they implicate non-judicial standards, such as the military's own standards for decisionmaking during a conflict. *Lane,* 529 F.3d at 562–563.

The record here shows that the U.S. military was involved in the sodium dichromate exposure that allegedly caused Plaintiffs' injuries. As discussed above, the military contracted with KBR to restore Quarmat Ali and was responsible for assessing sodium dichromate hazards at Quarmat Ali prior to KBR's arrival. In addition, even after KBR was on site, the military was involved in detecting and responding to the presence of sodium dichromate at Quarmat Ali. However, this involvement does not preclude the application of traditional tort standards to Plaintiffs' claims. In order to prevail on their claims, Plaintiffs must show that their injuries were caused by KBR and/or Halliburton's actions. However, Plaintiffs need not show that KBR and/or Halliburton were the sole actors that caused their injuries. Under the Restatement (Second) of Torts, a defendant may be found liable for a plaintiff's injury even if other actors, in addition to the defendant, can be causally linked to the injury. *See Lane,* 529 F.3d at 566–67 (citing Restatement (Second) of Torts §§ 448–449). For example, if the defendant is the cause in fact of the plaintiff's injuries, the defendant may be found liable for negligence even where others are involved. *Id.* at 567 (citing *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 549 (Tex.1985)). In this case, even though the military was involved in Plaintiffs' exposure to sodium dichromate, KBR's responsibilities for addressing sodium dichromate hazards under Task Order 3, and KBR's

actions in assessing and responding to the sodium dichromate hazards at Quarmat Ali, are significant enough for KBR's role in causation to be evaluated on its own. KBR's actions may thus be evaluated under traditional tort standards. The second *Baker* factor is not present, because the Court does not lack judicially discoverable and manageable standards for resolving Plaintiffs' claims.

### 3.

The third and fourth *Baker* factors are the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion and the impossibility of a court undertaking independent resolution of the issue without expressing lack of the respect due coordinate branches of government. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. As discussed above, the central issue here is whether KBR's actions caused Plaintiffs' injuries. Because KBR had significant responsibility for addressing sodium dichromate hazards under Task Order 3, and because KBR played a significant role in assessing and responding to the hazards, the issue of whether KBR caused Plantiffs' injuries may be resolved without second-guessing the military's decisions regarding Quarmat Ali. This case may be resolved without evaluating the military's policy determinations concerning Quarmat Ali and without expressing a lack of respect for the military's decisions. The third and four *Baker* factors are not present here.

### 4.

Neither Party asserts that the fifth *Baker* factor, an unusual need for unquestioning adherence to a political decision already made, applies here. *See Baker*, 369 U.S. at 217, 82 S.Ct. 691. The Court therefore declines to address the fifth *Baker* factor.

However, KBR argues that the sixth *Baker* factor, the potentiality of embarrassment from multifarious pronouncements by various departments on one question, applies. *See Baker*, 369 U.S. at 217, 82 S.Ct. 691. As the above discussion shows, the question here is whether KBR caused Plaintiffs' injuries. As of yet, no governmental department has issued any pronouncement finding that KBR caused Plaintiffs' injuries and is therefore liable for them. The sixth *Baker* factor therefore does not apply.

None of the *Baker* factors asserted by KBR apply here. Accordingly, KBR's motion to dismiss Plaintiffs' seventh amended complaint is DENIED on the political question issue.

### B.

■ KBR also argues that Plaintiffs' claims should be dismissed because they fall under the combatant activities exception in the Federal Tort Claims Act ("FTCA"). The FTCA provides a waiver of sovereign immunity for tort suits against the government. *See* 28 U.S.C. §§ 1346(b), 2671–80. However, it also provides for an exception from that waiver for "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j).

In determining what qualifies as "combatant activities," the Fifth Circuit has relied upon the definition of "combatant activities" in *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir.1948). *See Arnold v. United States*, No. 97–50779, 1998 WL 156318, *2 (5th Cir. March 18, 1998) (quoting *Johnson*, 170 F.2d at 770). The *Johnson* court found that the term "combatant activities" included "not only physical violence, but activities both necessary to and in direct connection with actual hostilities."

**666**

*Johnson,* 170 F.2d at 770. The *Johnson* court further stated:

> The act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a "combatant activity," but this fact does not make necessary a conclusion that all varied activities having an incidental relation to some activity directly connected with previously ended fighting on active war fronts must ... be regarded as and held to be a "combatant activity." ...
>
> The rational test would seem to lie in the degree of connectivity. Aiding others to swing the sword of battle is certainly a "combatant activity," but the act of returning it to a place of safekeeping after all of the fighting is over cannot logically be cataloged as a "combat activity."

*Johnson,* 170 F.2d at 770.

KBR's activities at Quarmat Ali were part of Project RIO, the U.S. government's attempt to restore oil production in Iraq. Their activities at Quarmat Ali did not aid others "to swing the sword of battle." *See Johnson,* 170 F.2d at 770. Instead, they related to restoring the "combat area" of Iraq to productive use after hostilities ended. *See id.* In *Bixby v. KBR, Inc.,* 748 F.Supp.2d 1224 (D.Or. 2010), a case involving the same defendants and the same dichromate exposure at Quarmat Ali, the District Court of Oregon found that the restoration of oil production at Quarmat Ali "was a foreign-policy-related goal rather than a combatant activity." *Id.* at 1246. This Court agrees. KBR's activities to restore water treatment operations at Quarmat Ali were not "necessary to or in direct connection with actual hostilities" in Iraq. The combatant activities exception of the FTCA therefore does not apply here.

Several courts have addressed the issue of whether the combatant activities excep-

tion extends to private contractors with the government. *See Saleh v. Titan Corp.,* 580 F.3d 1, 1–2 (D.C.Cir.2009); *Martin v. Halliburton,* 618 F.3d 476, 487 (5th Cir. 2010); *Koohi v. United States,* 976 F.2d 1328, 1333 (9th Cir.1992); *Ibrahim v. Titan Corp.,* 391 F.Supp.2d 10, 17 (D.D.C. 2005); *Bentzlin v. Hughes Aircraft Co.,* 833 F.Supp. 1486, 1492 (C.D.Cal.1993). However, the Fifth Circuit has not yet adopted a particular test for determining whether the combatant activities exception applies to a contractor. *Martin,* 618 F.3d at 487 n. 17. Because this case does not concern combatant activities, the issue of whether the combatant activities exception would apply to KBR is irrelevant. The Court declines to analyze whether the combatant activities exception should be extended here.

Because the restoration of oil production in Iraq is not a combatant activity, the combatant activities exception of the FTCA does not apply here. KBR's motion to dismiss Plaintiffs' seventh amended complaint under the combatant activities exception is DENIED.

**III.**

For the above reasons, KBR's Motion to Dismiss Plaintiffs' Seventh Amended Complaint under Rule 12(b)(1) and Rule 12(b)(6) is **DENIED.** (Instrument No. 217).

The Clerk shall enter this Order and provide a copy to all parties.